# IN THE SUPREME COURT OF IOWA

No. 19–0875

Submitted March 23, 2021—Filed June 4, 2021
Amended August 16, 2021

**AL POLLER** and **DEB POLLER,**

    Appellants,

vs.

**OKOBOJI CLASSIC CARS, LLC,**

    Appellee.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Dickinson County, Don E. Courtney, Judge.

Automobile owners seek further review of court of appeals decision affirming the district court decision that found the owners failed to make a valid claim under Iowa's Motor Vehicle Service Trade Practices Act and were not entitled to relief against their car restoration service for breach of contract and, instead, awarded the automobile restoration service damages in a counterclaim against the owners for breach of contract. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.**

Appel, J., delivered the opinion of the court, in which all justices joined.

Matthew G. Sease (argued) and Kylie E. Crawford (until withdrawal) of Sease & Wadding, Des Moines, for appellants.

Jordan M. Talsma (argued) and John R. Walker Jr. (until withdrawal) of Beecher, Field, Walker, Morris, Hoffman & Johnson, P.C., Waterloo, for appellee.

**APPEL, Justice.**

In this case, the owners of a 1931 Chevy claim that a company in the business of restoration of antique vehicles violated various provisions of the Motor Vehicle Service Trade Practices Act (MVSTPA), Iowa Code chapter 537B, and breached its contract with the owner. The company denied the claims, asserted affirmative defenses, and filed a counterclaim alleging breach of contract arising from the failure of its customer to pay an outstanding balance for restoration work on the vehicle.

After a two-day trial, the district court concluded that there were no violations of the MVSTPA and that the plaintiffs were not entitled to relief on their contract claim. The district court further held that the company was entitled to a verdict on its counterclaim and awarded damages of $67,396.15.

Plaintiff appealed. The court of appeals affirmed. According to the court of appeals, the plaintiff failed to prove "ascertainable" damages under the Iowa Consumer Fraud Act, which provides the remedies for violations of the MVSTPA. The court of appeals further upheld the district court's verdict on the breach of contract counterclaim.

We granted further review. For the reasons expressed below, we affirm in part and reverse in part, and we remand the case to the district court for the entry of judgment consistent with our opinion.

## I. Background Facts and Procedural History.

**A. Introduction.** Al and Deb Poller are residents of New Jersey who own a 1931 Chevy. Okoboji Classic Cars, LLC (OCC) is a company located in Spencer, Iowa, that is in the business of restoring antique cars.

After some preliminary communications, the Pollers shipped their disassembled 1931 Chevy from New Jersey to OCC for restoration in

November of 2013. In late December, the Pollers visited OCC in Iowa and made a $10,000 down payment on costs of the restoration project.

OCC commenced work on the vehicle in late 2013. Although the Pollers were told by OCC staff that they would receive monthly invoices, no invoices were sent to them during the first seven months of the project. In August of 2014, when OCC asked for additional payment for their work, the Pollers requested the unsent invoices. OCC promptly sent six invoices to the Pollers, which showed that after a credit for the $10,000 down payment, the Pollers owed OCC a balance of $39,560.27.

In the ensuing months, invoices accumulated as work continued on the restoration of the Pollers' vehicle. The Pollers paid an additional $35,000 to OCC in three separate payments after August of 2014 but did not satisfy the entire amount ultimately invoiced by OCC. According to OCC, the total cost of the restoration of the '31 Chevy came to $112,396.15. The balance OCC claimed the Pollers owed was $67,396.15.

In December 2014, Al Poller and his son arrived at OCC to see the car. OCC, however, refused to permit them to view the vehicle until bills were paid. OCC placed the car in storage and refused to allow the Pollers to inspect it, apparently asserting an artisan's lien under Iowa Code section 577.1.

Ultimately, OCC permitted an expert to view the vehicle for appraisal purposes. The expert concluded that the quality of the restoration work on the vehicle was excellent and that the cost to restore a vehicle to the quality observed would be in excess of $100,000. Yet, the expert opined that the current fair market value of the restored vehicle itself was $37,900.

**B. Overview of Petition and Counterclaim.** The Pollers filed a petition with three counts relevant to this appeal. In count I, the Pollers

sought a declaratory judgment regarding the nature of the contractual relationship of the parties. According to the Pollers, the parties "agreed (at least implicitly), that the costs of restoration would not greatly exceed the overall value of the final finished product." The Pollers sought a declaration that with their total remittance of $45,000, they had "paid the proper amount for the restoration of the '31 Chevy."

In count II of the amended petition, the Pollers alleged breach of contract and breach of the duty of good faith and fair dealing. They alleged that there existed a valid and enforceable contract between the Pollers and OCC and that the Pollers had met the necessary terms of the contract by "paying a reasonable and fair amount for the work performed on the '31 Chevy." The Pollers claimed OCC breached the contract by making demands for payment outside the scope of any contractual agreement and by failing to return the vehicle to the Pollers after receiving payment for services.

In count IV of their amended petition, the Pollers alleged violations of the MVSTPA. The Pollers claimed that OCC violated section 3 of the MVSTPA by failing to disclose that the Pollers had a right to an estimate, failing to provide an estimate, and failing to have proper forms documenting the transaction. *See* Iowa Code § 537B.3. In the alternative, the Pollers pled that if the ballpark figure was, in fact, an estimate, OCC violated section 6 of the MVSTPA by not obtaining oral or written authorization from the consumer when the costs of the repairs or service amounted to more than ten percent above the original estimate. *See id.* § 537B.6(3).

Further, the Pollers charged that OCC violated section 6 of the MVSTPA in other ways. They claimed that OCC improperly charged them for disassembly and reassembly or partially completed work without

obtaining authorization in advance. *See id.* § 537B.6(5). The Pollers alleged that they incurred charges that they had not authorized, including storage fees for their vehicle. *See id.* § 537B.6(6). Further, the Pollers asserted that OCC "materially and intentionally understate[d] or misstate[d] the estimated cost of the repairs or service." *See id.* § 537B.6(12).

Because of the above violations, the Pollers sought damages, including damages for loss of use of the '31 Chevy and money previously paid. The Pollers also sought injunctive relief seeking to enjoin OCC in order to protect the public from further violations. *See id.* § 714H.5(1). The Pollers further sought an award of attorney fees under Iowa Code section 714H.5(2). Finally, the Pollers sought statutory damages up to three times the actual damages because the actions of OCC were alleged to be in willful and wanton disregard for the rights of consumers. *See id.* § 714H.5(4).

OCC generally denied many of the Pollers' allegations in their claims. Notably, however, OCC admitted that in approximately November of 2013, the parties entered into an oral contract in which OCC was to restore the Pollers' '31 Chevy. OCC further pled affirmative defenses of estoppel, waiver, laches, and acquiescence.

In addition, OCC brought a counterclaim for breach of contract. In the counterclaim, OCC alleged that an oral contract between the parties was reached. Under the oral agreement, OCC made it clear that the charges were on a time and materials basis, with labor being charged at the rate of $65 per hour. OCC alleged that the Pollers were provided with periodic billings and encouraged OCC to continue work on the vehicle. OCC asserted that it continued work until the car was completed without any indication from the Pollers that they should cease working on the

vehicle. OCC asserted that the Pollers were in breach of contract for failure to make payments for work on the completed car and sought damages plus interest. Further, OCC asked the court to permit it to maintain possessory control of the vehicle pursuant to its lien until the judgment of the court, including interest and costs, was satisfied.

In response to OCC's counterclaim, the Pollers admitted that OCC refused to provide an estimate but otherwise denied the allegations. As affirmative defenses, the Pollers claim that OCC breached the contract by failing to deliver the vehicle in a timely manner and demanding an amount beyond that agreed to by the parties. The Pollers further asserted that there was no mutual assent to the terms of the contract. The Pollers also claimed that OCC breached the contract first, thus excusing performance. Finally, the Pollers charged that any alleged contract is illegal under the MVSTPA and is therefore void. Finally, in light of the statutory violations, the Pollers claimed that OCC was precluded from receiving any payment from them.

**C. Trial Before the District Court.** The district court held a two-day trial in January 2018. Witnesses at trial included Deb Poller, Al Poller, a former OCC employee Robert Kirschbaum, and current OCC employees Denny Linn, April Torrence, and Ken Potter. Exhibits were admitted into evidence that included OCC invoices and backup documents, a number of email communications between the Pollers and OCC, photographs of the car during the work in progress and upon completion, and the report of the expert on the value of the restored vehicle and the work done by OCC.

Many of the facts were undisputed and well documented in the record. But there were two key factual disputes at trial.

First, the Pollers claimed that early in December 2013, an employee of OCC provided them with what the Pollers claim either was a nonbinding

ballpark statement or, in the alternative, an initial estimate of $45,000 for the restoration project. The OCC employees who testified at trial denied that such a representation was made.

Second, OCC offered testimony that all of the work on the vehicle was approved by the Pollers. OCC notes that it maintained close contact with the Pollers as the project progressed, and when the invoices were sent to the Pollers in August of 2014 and in later months, the Pollers did not voice any objection to the invoices. The Pollers testified that they never authorized any expenditures above $45,000 nor did they authorize certain categories of expenses reflected in the invoices.

**D. Overview of Findings of Fact and Conclusions of Law by the District Court.**

1. *Findings of fact.* The district court found the facts as follows. Al and Deb Poller are residents of New Jersey. The Pollers have owned a 1931 Chevrolet four-door Sedan since the late 1990s. The Pollers began restoring their Chevy in the 1990s but put it on hold to raise their family.

In July 2013, Deb Poller, while visiting her family near Spencer, Iowa, visited the OCC museum. OCC's museum also contained a body shop where OCC employed restoration specialists to restore vehicles for the museum as well as work on automobile restoration projects for private owners. Visiting the museum prompted Deb to inquire into completing the restoration project on her Chevy. Deb discussed the potential restoration of her Chevy with OCC's officer manager, April Torrence. After Deb asked about the potential cost of the project, April told Deb that OCC has a policy to not provide estimates of quotes for restoration projects because of the variability and unknown conditions related to each individual project.

By November 2013, the Pollers decided that they wanted OCC to restore their Chevy. Deb sent April an email stating that the Pollers would ship their Chevy to OCC to be restored but conditioned the project on OCC providing a quote. OCC's shop manager, Denny Linn, responded to Deb's email saying that OCC does not provide estimates for the total cost of restoration projects and that he could not give Deb an estimate on her car specifically because he did not know the condition of the Chevy. In his reply, Denny told Deb that OCC would work on the Chevy based on "time and materials," meaning that OCC would do restoration work for $65 per hour plus the materials for the project. Denny's reply to Deb consisted of the following:

> Thank you for sending the pictures of the 31 Chevy, I just saw them today for the first time. It looks like a pretty nice car. Is it complete? It is very hard for us to give you a quote or estimate. In fact we don't give estimates. Our experience has been that you can never see what problems may arise as we work on the car. What I can tell you is that we charge $65.00 an hour for work done in the shop. We do the mechanical work, the body work and the upholstery work for $65.00 an hour plus materials. We would restore or alter the car, what-ever your interests maybe, while keeping you involved in the decision making along the way. Right now we are booked up over a year in advance. In our shop we have area experts in the mechanics, body, and upholstery fields and with your input into what you want, I am sure that we could build you a very nice car.

Soon after receiving the email, Deb shipped the Chevy to OCC, and all of the parts, consisting of four boxes, a motor, and a chassis, arrived on November 26. At the time of arrival, an OCC employee unpacked all of the boxes and determined that the Chevy appeared to be in excellent condition and contained all of the major parts. The exception to the excellent condition was surface rust and a dent near the roof that likely occurred during transport.

Denny sent an email to Deb notifying her that the shipment arrived and that they took pictures of all of the parts. The email stated, "You have a really nice car here. It looks like it made the trip pretty well" aside from the rust and small dents. He also indicated that OCC was one and a half to two years away from restoring the Chevy because of the number of projects ahead of the Pollers' Chevy. Deb replied saying "NO WAY!!! Talk to April, I have been on the schedule since summer." Denny responded that OCC had a number of cars they committed to restore ahead of the Pollers' Chevy but that OCC would do some preliminary work and get to the more major work as soon as possible. Denny indicated that if the Pollers were not satisfied with that arrangement, they should let OCC know so OCC could discontinue work on the Chevy. Denny also said that OCC would be in touch so that OCC and the Pollers could discuss more detailed plans about the project.

Deb responded by email that she would be visiting Okoboji around Christmas and that they could discuss specifics at that time. The Pollers visited OCC on December 27. The Pollers wanted the restoration work completed by August 15, 2014, to participate in a car cruise event. Denny took notes during the meeting, and the notes indicated that the Chevy would be restored to its original condition, with a modified paint job, and installation of a stereo.

Deb discussed putting a $10,000 down payment on the project, and despite April saying OCC had never taken a down payment, OCC accepted the money. April also told Deb that OCC would be providing monthly invoices, which was a new policy of OCC's, beginning in 2014. Al also said that during the meeting, an OCC employee said the restoration would probably cost between $35,000 and $40,000, with an additional $5,000 to $10,000 cost depending on choices the Pollers made.

Over the next several months, OCC worked on various parts of the Chevy. OCC communicated with the Pollers regarding updates on the work as well as asking the Pollers for their input on various decisions. There were over forty email exchanges between OCC and the Pollers. The first emails consisted of updates on engine parts and issues that third-party contractors discovered with the engine. Denny discussed the problems and the price to fix the problems, and the Pollers approved of the costs as long as the repairs were what the third-party recommended.

Subsequent emails discussed the top speed of the engine and how the engine could be "geared up" to be more comfortably driven on the highway or in the alternative to replacing the gears, the use of larger tires. Deb said that they did not want the larger tires because they would be using the Chevy as a parade car.

A set of emails by Denny in May first indicated that there was a lot of work left to do on the Chevy. Additional emails discussed the color to be painted. Denny also discussed upgrading the electrical system so that more safety features could be added to the Chevy, including a second tail light, turn signals, and four-way flashers, and that the upgraded system would allow for electric wipers, a stereo system, and a cigarette lighter. Deb replied that they would like the upgraded electrical system and wanted a specific metallic purple color for the Chevy.

In June, Denny told the Pollers that the fuel tank needed to be replaced due to rusting. He provided two options, one for $1000 and another for $1155. Deb replied that they would like the $1155 option. Denny replied that they were putting many hours into the project and sending out lots of parts for rebuilding. In another email, Denny discussed parts needed for the rear gearing, including a ring and pinion set which would cost $1320, and updated Deb that chromed items were sent to be

rechromed and would be back in five weeks. Deb replied, "[W]hy were the chrome items not sent out until now? Also regarding the gear out, we discussed this almost 2 months ago and gave our approval. How is this car ever going to be completed by Aug 15th?" Denny's reply consisted of a continued discussion of the color, ring and pinion gears, and rear luggage rack. He also said, "[W]e may not have the car ready for the mid-August pick up."

In July, Denny sent emails regarding the radiator, stating that for the radiator to look like original, it would cost around $3000 but a modern style radiator would be $1050 and said that it may take some time before the radiator is completed. Deb responded:

> We are very concerned about the time frame on our car. You have had the car since Nov. 2013 with the agreement that it would be done this summer. We met with you over Christmas, went over details, set a date for Aug 16, now within the last 2 weeks we are looking for gears on rear end, sending out chrome and now addressing radiator, all issues according to you will take a while some time, at least 5–6 weeks on just the chrome. We have asked before, why wasn't this done before now? What has been done since Dec. 2013?

Denny did not address Deb's questions, instead continuing to discuss the paint and radiator.

In July, Deb was in Iowa and checked in on the progress at OCC. Deb met with an upholstery person to discuss details. After the visit, Denny sent Deb an email with pictures of the new radiator and asked the Pollers for an additional payment. In response, Al replied saying that they never received any monthly invoices from OCC and asked OCC to send the invoices.

On August 6, OCC sent six invoices that demonstrated OCC had used the $10,000 initial down payment and that the Pollers owed an additional $39,560.27. The Pollers asked for an itemization of work. While

the itemization was being sent, the Pollers were sent an additional invoice showing another $25,000 of work since August 6.

Denny sent more progress pictures at the end of August and also stated that they were putting in many hours and paying for a lot of parts for the Chevy. He again asked for a check from the Pollers. The Pollers made a payment of $15,000 on September 11. Denny asked for additional payment on October 7 if they wanted OCC to continue work on the Chevy and told the Pollers that if they wanted OCC to discontinue work, they would move the Chevy to a secured warehouse. He indicated that the Pollers had paid $25,000 up to that point but that OCC had $21,219.19 of parts for the Chevy in OCC's warehouse. He also said OCC would send the itemization that the Pollers requested.

The Pollers had sent a check to OCC on October 6 for $10,000. On October 31, Denny sent an email informing the Pollers of various work being performed and wondered whether the Pollers had sent an additional check. The Pollers sent a check for $10,000 on November 13. The Pollers made no further payments. On November 14, the outstanding balance was $50,694.93, and after completion of the project on December 31, the balance was $66,705.70.

In January 2015, the Pollers hired an automobile appraiser to appraise the Chevy. OCC initially refused to allow the appraiser access to the Chevy but eventually the appraiser was given access. The appraiser determined that the car was in excellent condition and said that the type of restoration he saw would cost in excess of $100,000. The Chevy is still in OCC's possession and OCC continues to send the Pollers invoices.

2. *Conclusions of law.* The district court first addressed the Pollers' claims under the MVSTPA. The district court held that "Deb's action of shipping the '31 Chevy was an acceptance of OCC's offer, authorizing OCC

to restore her '31 Chevy based upon their $65.00 per hour time plus the cost of materials." The district court stated that Iowa Code section 537B.3(2)(*b*) gives a supplier "the choice to write the written estimate on the authorization form, or state an hourly labor charge." Since OCC provided an hourly rate, the district court determined that OCC complied with the provision. The district court further determined that because Deb shipped the parts, rather than requesting repairs in writing or orally, the disclosure requirements of subsections 1 and 3 of Iowa Code section 537B.3 and were not triggered.

The district court also concluded that OCC did not engage in other deceptive activity under section 537B.6. The district court rejected the claim that OCC violated the MVSTPA by not obtaining authorization when the amounts exceeded the initial estimate by ten percent. *See* Iowa Code § 537B.6(3). The district court concluded that there was no estimate; therefore, no violation of the ten percent rule.

The district court did not directly address other potential violations of the MVSTPA regarding unauthorized work. But the court noted that all modifications were authorized by the Pollers through email and that detailed invoices demonstrating that the charges OCC imposed were all directly related to restoration. As a result, the district court ruled that the plaintiffs failed to prove any violations of the MVSTPA.

On the breach of contract claims, the district court determined that the Pollers breached the contract. The district court found the Al Poller's testimony that he received an oral estimate of $45,000 was against the weight of the evidence. So, any claim that costs above the "agreed upon amount" lacked mutual assent was without merit.

The district court also determined that the Pollers' claim that OCC charged a thirty percent markup on parts in violation of the agreed-upon

contract was without merit. The district court found that OCC sold parts below fair market value, even after the thirty percent markup.

Finally, the district court determined that OCC's failure to send monthly invoices at the beginning of the project was not a material breach. The district court found that the Pollers did not dispute any of the invoices or request work be cancelled. OCC continued with the project and continued to request payments from the Pollers.

The district court found that OCC provided general billing statements and detailed itemization of the bill. The district court found "[t]he evidence is clear, and without dispute, that every stage of the restoration process was a work in progress that involved the Plaintiffs in the decision matrix that led to the ultimate cost of the time and materials billed." The district court said that if the plaintiffs believed they were only required to pay $45,000, then "they had a duty to terminate their relationship and not authorize further expense." The district court noted that the Pollers did not mitigate their damages despite having the opportunity to have OCC set aside the Chevy. The district court concluded that the Pollers materially breached the contract by only paying $45,000 when the total cost of the project amounted to $112,396.15. Thus, the Pollers were in breach for failure to pay the unpaid balance of $67,396.15. The district court entered a judgment in favor of OCC in that amount.

**E. Decision of the Court of Appeals.** The court of appeals, in a per curiam opinion, affirmed the district court ruling. The court of appeals assumed, without deciding, that the MVSTPA applied to the transaction. In discussing the Pollers' claim that OCC violated the MVSTPA, the court of appeals majority emphasized the findings of fact of the district court that all the work performed by OCC was authorized. Because the work was "authorized," the court of appeals majority held that that the Pollers

could not prove "actual damages" under Iowa Code section 714H.5. In support of its holding, the court of appeals majority cited a footnote in *Kaskin v. John Lynch Chevrolet-Pontiac Sales, Inc.* stating that "a customer finding a violation of the written estimate requirement has not suffered a pecuniary loss if the customer admits to authorizing to the repairs." 767 N.W.2d 394, 402 n.6. (Wis. Ct. App. 2009).

The court of appeals majority also held that the Pollers did not establish that OCC committed a willful or wanton breach of Iowa Code chapter 537B that would entitle them to exemplary damages. The court of appeals majority reasoned that the district court finding in favor of OCC on its breach of contract counterclaim made it clear that the standard for exemplary damages was not met. In support of its holding, the court of appeals majority cited *Scibek v. Longette*, 770 A.2d 1242 (N.J. Super. Ct. App. Div. 2001). In *Scibek*, the court found that there was no "ascertainable loss" arising from the failure of a repair shop "to provide a written estimate and obtain a written authorization." *Id.* at 1249–51.

The court of appeals majority next turned to OCC's breach of contract claim. The court of appeals majority recognized the argument advanced by the Pollers that it would be illogical and against public policy to permit collection of monies earned in violation of a consumer protection statute. But, the court of appeals majority noted that Iowa Code section 714H.5 limits damages to " 'actual damages' incurred 'as the result of a prohibited practice.' " Based on its conclusion that the Pollers are not entitled to damages based upon alleged violations of the MVSTPA, the court of appeals majority concluded that OCC "is not foreclosed from recovering damages on its breach-of-contract counterclaim based on its violation of chapter 537B."

The court of appeals majority finally considered whether OCC breached the parties' agreement by failing to provide timely billing. The court of appeals majority noted that the district court found that OCC did not provide timely billing, but the court put the onus on the Pollers for failing to insist on adherence to timely billing while OCC continued to work on the car. As a result, the court of appeals majority found that the Pollers acquiesced in the delayed billing.

A special concurrence determined that the antique auto restoration business of OCC was subject to the terms of the MVSTPA. *See Schuster v. Dragone Classic Motor Cars, Inc.*, 98 F. Supp. 2d 441, 448 (S.D.N.Y. 2000); *Montgomery v. Nostalgia Lane, Inc.*, 891 N.E.2d 994, 999, 1001 (Ill. App. Ct. 2008). Further, the special concurrence reasoned that a dissembled vehicle was within the scope of the statute. *In re Baily*, 326 B.R. 750, 757 (Bankr. S.D. Iowa 2004). Further, the special concurrence concluded that the OCC violated the MVSTPA by failing to provide the Pollers an estimate as required by subsections 2(*b*) and 3 of Iowa Code section 537B.3.

The special concurrence also considered the impact of the Pollers sending the car to OCC for repairs without having obtained an estimate. According to the special concurrence, the conduct of the Pollers does not provide a waiver, noting, in part, that under Iowa Code section 537B.6(2), a supplier cannot condition services on waiver. Further, the special concurrence found that while the Pollers could have taken action to mitigate their expenses, mitigation has no bearing on whether OCC violated chapter 537B.

Yet, like the majority, the special concurrence determined that the Pollers did not prove actual damages from the violation of the MVSTPA. The special concurrence further agreed with the majority's disposition of OCC's breach of contract claim.

**II.  Standard of Review.**

"In a law action tried to the court, our review is for the correction of errors at law, and the district court's findings of fact are binding on us if they are supported by substantial evidence." *Wolf v. Wolf,* 690 N.W.2d 887, 892 (Iowa 2005).

**III.  Overview of the Iowa Motor Vehicle Service Trade Practices Act and Private Right of Action Under the Iowa Consumer Fraud Act.**

We begin with a brief overview of the relevant statutory provisions in this case.  Iowa Code chapter 537B is entitled the "Motor Vehicle Service Trade Practices Act."  Iowa Code § 537B.1.  The MVSTPA covers transactions between consumers and suppliers "for, repairs or service upon a motor vehicle used primarily for farm or personal use."  *Id.* § 537B.2(1).  After providing a series of definitions in Iowa Code section 537B.2, the MVSTPA contains provisions related to estimates and documentation required before services are provided, provisions related to various trade practices, aftermarket parts, and deceptive acts or practices. *Id.* §§ 537B.3, .4, .6.

Importantly, a violation of the MVSTPA is an unfair practice under the Iowa Consumer Fraud Act.  *Id.* § 714.16(2)(*k*); *State ex rel. Miller v. Vertrue, Inc.,* 834 N.W.2d 12, 31 n.8 (Iowa 2013).  Under the Iowa Consumer Fraud Act, a private party may seek "actual damages."  Iowa Code § 714H.5(1).  Actual damages are "all compensatory damages proximately caused by the prohibited practice or act that are reasonably ascertainable in amount."  *Id.* § 714H.2(1).  In addition, section 714H.5(4) provides exemplary damages for "willful and wanton disregard for the rights or safety of another."  Finally, attorney fees are recoverable where statutory violations are proven and actual damages are awarded.  *Id.* § 714H.5(2).  As a consumer protection statute, the terms of the MVSTPA

should be interpreted liberally in favor of the consumer. *State ex rel. Miller v. Cutty's Des Moines Camping Club, Inc.*, 694 N.W.2d 518, 528 (Iowa 2005); *State ex rel. Turner v. Koscot Intrerplanetary, Inc.*, 191 N.W.2d 624, 630 (Iowa 1971); *Levin v. Lewis*, 431 A.2d 157, 161 (N.J. Super. Ct. App. Div. 1981).

### IV. Coverage Under the MVSTPA.

#### A. Positions of the Parties.

1. *The Pollers.* The Pollers assert that the restoration services provided by OCC were within the scope of the MVSTPA. The Pollers claim that they are "consumers" and OCC is a "supplier" under the Act. Under the Act, a consumer is defined as "a person contracting for, or intending to contract for, repairs or service upon a motor vehicle used primarily for farm or personal use." Iowa Code § 537B.2(1). A motor vehicle under Iowa Code section 537B.2(2) is "a motor vehicle as defined in section 321.1 which is subject to registration." In turn, Iowa Code section 321.1(42)(*a*) defines motor vehicle as "a vehicle which is self-propelled and not operated upon rails." A "supplier" is "a person offering to contract for repairs or service upon a motor vehicle." *Id.* § 537B.2(3).

At the outset, the Pollers address a generalized concern that the MVSTPA was not intended to cover transactions for the restoration of antique cars. They note that such restoration work has been held to be within the scope of similar statutes in a number of jurisdictions. *Schuster*, 98 F. Supp. 2d at 448–49; *Schreiber v. Kelsey*, 133 Cal. Rptr. 508, 510 (App. Dep't Super. Ct. 1976); *Morris v. Gregory*, 661 A.2d 712, 716 (Md. 1995); *Levin*, 431 A.2d at 160; *Jagodzinski v. Jessup*, 572 N.W.2d 515, 517 (Wis. Ct. App. 1997); *Webb v. Ray*, 688 P.2d 534, 537 (Wash. Ct. App. 1984).

In order to be a "consumer" under the MVSTPA, the repair work must be done on a "motor vehicle" within the terms of the statutory provisions. Although their '31 Chevy was disassembled when sent to OCC, the Pollers assert that does not matter. The Pollers claim that when delivered to OCC, the '31 Chevy was complete with all major necessary components provided.

In support of their position, the Pollers cite *In re Baily*, 326 B.R. 750. In *In re Baily*, the court held that "the ordinary and common meaning of the term 'motor vehicle' includes an inoperable vehicle that can be made operable by reassembling one [or] more of its parts or by repairing one or more of its parts." *Id.* at 757–58.

The Pollers recognize that in order to be a "motor vehicle," the vehicle must be "subject to registration." The Pollers assert that upon completion of the work, the vehicle will be subject to registration under the laws of New Jersey. They claim as a matter of statutory interpretation that the word "is" includes the future because under Iowa Code section 4.1(33), "[w]ords in the present tense include the future." Therefore, according to the Pollers, the fact that the vehicle upon completion of the restoration would be subject to registration is sufficient to bring the restoration work within the scope of the MVSTPA.

2. *OCC.* OCC denies MVSTPA coverage. OCC makes the general claim that restoration of antique cars is simply not the type of activity that the legislature intended to regulate under the MVSTPA. They cite two cases from Massachusetts for the proposition that the repair work on classic cars "customarily require[s] several months, if not years, to complete and routinely cost twenty to thirty thousand dollars." *Devito Auto Restoration v. Card*, No. 9657, 2000 WL 1426124, *3 (Mass. Dist. Ct.

Sept. 15, 2000); *see also Gulbankian v. Harabedian*, No. 01WAD014, 2002 WL 480952, *3 (Mass. Dist. Ct. Mar. 25, 2002).

OCC notes that the cases cited by the Pollers for the general proposition that classic auto restoration is subject to similar acts are not persuasive because of differences in statutory language. OCC claims that the Iowa statute was designed to protect consumers who use their vehicles for daily transportation, not for owners of antique cars. In support of its argument, OCC cites an affidavit from a distinguished former state legislator who declared that chapter 537B was not intended to apply to restoration of dismantled vehicles incapable of operating on the roadway "because there are too many unknowns in the car restoration industry and restoring vehicles is not an exact science." Because OCC had a policy of not providing estimates, OCC argues that the Pollers cannot use the MVSTPA as a sword against them for authorized work.

OCC then turns to the question of whether the Pollers '31 Chevy is a "motor vehicle." OCC directs our attention to *Nelson v. Merchants Bonding Co.*, 425 N.W.2d 433 (Iowa Ct. App. 1988). In *Nelson*, the court of appeals held that a collection of automotive parts did not constitute a "motor vehicle" under Iowa Code section 321.1. *Id.* at 436. OCC urges us to follow a similar approach here.

OCC also addressed the case *In re Baily* cited by the plaintiffs. According to OCC, while OCC recognizes that the court in *In re Baily*, 326 B.R. at 757, stated that the term 'motor vehicle' includes "an inoperable vehicle that can be made operable by reassembling one [or] more of its parts or by repairing one or more of its parts," OCC argues, however, that the case does not mean that a "completely assembled, inoperable vehicle" which can only be made operable by replacing and rebuilding numerous essential parts, is included within the term.

Finally, according to OCC, the disassembled vehicle was not "subject to registration" within the meaning of Iowa Code section 321.18. OCC argues that the Pollers have never held a certificate of title to the '31 Chevy and have never registered the vehicle. But, according to OCC, the reading of the statute is unreasonable or absurd because the '31 Chevy would have been subject to registration for the thirteen years it was held in storage.

Instead, OCC points to Iowa Code section 321.18 to assist in the interpretation of the term "subject to regulation" in the MVSTPA. Under this provision, "[e]very motor vehicle, trailer, and semitrailer when driven or moved upon a highway shall be subject to the registration provisions of this chapter." *Id.* § 321.18. OCC claims that motor vehicles are subject to registration only when "driven or moved" on the highway, and not one minute before.

**B. Discussion.**

1. *Restoration of antique cars.* We begin our discussion of the applicability of the MVSTPA by considering whether restoration of antique cars is within the scope of the statute. We recognize that there is some authority from Massachusetts standing for the proposition that antique restoration is not subject to a similar statute because of its unique characteristics. In *Devito Auto Restoration*, the court held that a business that restores antique cars is not a repair shop because the work "customarily require[s] several months, if not years, to complete and routinely cost twenty to thirty thousand dollars." *Devito Auto Restoration*, 2000 WL 1426124 at *3; *see also Gulbankian*, 2002 WL 480952 at *3. And, we recognize that OCC offered an affidavit from a prominent state legislator stating that the legislature did not intend to include antique restoration such as that engaged in by OCC within the scope of the statute.

Yet, the overwhelming majority of authority in other states points in the opposite direction. *See Schuster,* 98 F. Supp. 2d at 448–49 (holding that restoration is subject to Connecticut's consumer fraud act); *Schreiber,* 133 Cal. Rptr. at 510 ("Restoration is not a stated exception to the statute."); *Morris,* 661 A.2d at 716 (Md. 1995) ("[W]e see no reason to draw a distinction . . . between repair and restoration."); *Levin,* 431 A.2d at 160; *Jagodzinski,* 572 N.W.2d at 517 ("[T]here is nothing within the code to suggest that the repairs were meant to be excluded simply because they amounted to a 'restoration.' "); *Webb,* 688 P.2d at 537.

We conclude that the restoration of antique automobiles is within the scope of the MVSTPA if the relevant statutory criteria are met. There is nothing in the statute that suggests that the age of the motor vehicle is relevant to coverage, nor is there an exception for restoration of "classic" or "antique" motor vehicles. *Schreiber,* 133 Cal. Rptr. at 510; *Morris,* 661 A.2d at 716; *Jagodzinski,* 572 N.W.2d at 517–18. Instead, the legislation broadly applies to "a motor vehicle used primarily for farm or personal use." Iowa Code § 537B.2(1). While OCC has offered an affidavit from a legislator to the contrary, we have held that statements by individual legislators in litigation are inadmissible on the question of legislative intent. *Roades v. State,* 880 N.W.2d 431, 447 (Iowa 2016). We do not depart from that precedent today. We hold that if there is to be a carve out from the statute for the restoration of antique automobiles, it is up to the legislature to provide one.

2. *Definition of "motor vehicle."* We now turn to the question of whether the '31 Chevy was a "motor vehicle" under the statute. We conclude that the fact that the vehicle was disassembled and inoperable at the time of delivery is of no moment. Autos that need repair are often

inoperable, of course, and the separation of an auto into component parts does not change the nature of the repair activity.

The question was considered in an insurance context in *Robertson v. Nationwide Mutual Insurance,* 569 A.2d 565 (Conn. App. Ct. 1990). There, a disassembled antique car that was not currently operable was stored in the insured's garage. *Id.* at 565. The policy in that case had an exclusion for "motorized land vehicles . . . designed for travel on public roads as subject to motor vehicle registration." *Id.* at 566 (omission in original). The court found that the vehicle qualified as a motor vehicle as it "was designed for highway travel" and "would be subject to vehicle registration when that use was made." *Id.*

Of course, a mere miscellaneous assembly of parts is not a "motor vehicle." *Nelson,* 425 N.W.2d at 436. In *Nelson,* many essential parts were missing, such as the engine, radiators, and wheels. *Id.* But here, OCC's manager testified that the car was "a really nice car" and a former employee characterized the vehicle as "very complete." Unlike in *Nelson,* the former employee testified that "the major components were there, the motor, transmission, frame, running gear, wheels." The testimony of Al Poller that the vehicle was "[a]lmost drivable" was unrebutted.

Based on the facts developed at trial, we conclude that the approach of the bankruptcy court in *In re Baily* applies here. In *In re Baily,* the bankruptcy court found that the term "motor vehicle" includes an inoperable vehicle that can be made operable through repair. 326 B.R. at 757–58; *see also Sprenger v. Trout,* 866 A.2d 1035, 1046 (N.J. Super. Ct. App. Div. 2005) (rejecting "roadworthiness" limitation and noting that "[c]ourts have consistently rejected creative attempts to narrow the scope of the [statute] by technical definitions and artificial distinctions"). We think the teaching of *In re Baily,* rather than *Nelson,* controls here.

3. *"Subject to registration."* The final question is whether the '31 Chevy meets the "is subject to registration" requirement. We think it does. We regard the "is subject to registration" requirement as designed to separate automobiles from other motor vehicles such as ATVs, golf carts, and riding lawn mowers. *See N. Sec. Ins. v. Rossitto,* 762 A.2d 861, 863 (Vt. 2000) (stating that ATVs used on easements are not subject to registration under Vermont statute); *Progressive N. Ins. v. Pippin,* 725 F. App'x 717, 720 (10th Cir. 2018) (stating that a golf cart is not a motor vehicle under Oklahoma statute); *Farm Bureau Mut. Ins. v. Kurtenbach ex rel. Kurtenbach,* 961 P.2d 53, 58–59 (Kan. 1998) (holding that a "street legal" motorcycle was the *type* of motor vehicle subject to registration despite its part-time *use* as an agriculture implement); *Argonaut Ins. v. Colonial Ins.,* 138 Cal. Rptr. 855, 857 (Ct. App. 1977) (stating that a backhoe loader is not type of equipment subject to registration).

In other words, we find the statute is categorical, namely, that the phrase "motor vehicles subject to registration" is designed to ensure that vehicles that are commonly known as automobiles and cars that travel on the state's roads are within the scope of the act. *Kimball v. New England Guar. Ins.,* 642 A.2d 1347, 1348–49 (Me. 1994) (holding that for the purposes of what type of vehicle is subject to registration, what matters is whether the type of vehicle is subject to registration, not whether the owner actually intends to register the vehicle).

As a result, the restoration of a disassembled vehicle for the purpose of providing an operable motor vehicle falls within the scope of the MVSTPA. In this case, there was undisputed testimony that the completely restored automobile would be subject to registration in New Jersey, the residence of the Pollers. We conclude that the "subject to

registration" requirement does not take the restoration project in this case outside the scope of the MVSTPA.

**V. Alleged Violations Under the MVSTPA.**

**A. Overview.** Having determined that the MVSTPA covers the transaction between the Pollers and OCC, we now turn to whether the Pollers established any violations. The burden of proof is on the plaintiff to prove each element of a statutory violation.

**B. Violation of Iowa Code Section 537B.3 (Required Disclosures).**

1. *The Pollers.* The Pollers claim that OCC violated the requirements of Iowa Code section 537B.3. This section of the statute mandates that suppliers notify a consumer of several rights. Specifically, the statute requires the supplier must maintain authorization forms which contain "a conspicuous disclosure in substantially the following language":

**ESTIMATE**

You have the right to a written or oral estimate if the expected cost of repairs or service will be more than fifty dollars. Your bill will not be higher than the estimate by more than ten percent unless you approve a higher amount before repairs are finished. Initial your choice:

............................... Written estimate.

............................... Oral estimate.

............................... No estimate.

............................... Call me if repairs and service will be more than $...............................

Iowa Code § 537B.3(1).

In addition, the MVSTPA requires the form to provide the date, the supplier's name, the customer's name and phone number, and the reasonably anticipated completion date. *Id.* § 537B.3(2)(*a*).

The MVSPTA contains provisions about the manner of execution of the authorization forms. Under Iowa Code section 537B.3(2)(*b*), if the consumer requests a written estimate, the supplier may use the written authorization form or another form. If, however, "the nature of repairs or service is unknown at the time that the estimate is given, the supplier may state an hourly labor charge for the work." *Id.*

According to the Pollers, OCC failed to comply with Iowa Code section 537B.3 in several ways. Prior to shipping the car, Deb asked for an estimate. In response, OCC did not provide an estimate but instead declared that they "work for $65 an hour plus materials." But the statute, according to the Pollers, requires that the customer be notified of their right to seek an estimate. *Id.* § 537B.3(3).

In addition, the Pollers assert that under the statute, a supplier is required to provide to the consumer an estimated completion date. *Id.* § 537B.3(2)(*a*)(4). The Pollers assert that completion date was a significant factor to them and that they were never provided an estimated finish date as required by the statute.

Further, under Iowa Code section 537B.3(1), the Pollers claim they were entitled to be informed of their right to impose a budget cap on project expenses without express authorization. The Pollers claim that they were interested in disciplining the cost of the project as reflected in the requests for invoices as the project advanced. They claim OCC violated the statute by not expressly offering them the option of capping expenses without further authorization.

2. *Position of OCC.* OCC asserts that the language required by section 537B.3(1) is only required "[i]f a consumer authorizes, in writing, repairs or service upon a motor vehicle prior to the commencement of the repairs or service." Here, OCC points out, the Pollers did not authorize the

restoration service in writing but instead authorized the restoration service by conduct.

Further, OCC asserts that the statute does not require an estimate in all instances. They note that under Iowa Code section 537B.3(2)(*b*), "[i]f the nature of repairs or service is unknown at the time that the estimate is given, the supplier may state an hourly labor charge for the work." OCC cites the plaintiff's case of *Levin v. Lewis* in support of its claim. In *Levin*, the court specifically noted that the supplier did not tell the consumer that he worked only on a time and materials basis. 431 A.2d at 157–58.

3. *Discussion.* We first consider the assertion of OCC that because the request was not in writing, OCC was not required to provide an estimate form. Iowa Code section 537B.3 establishes a two-tiered framework for documentation. If a customer authorizes repairs in writing, the supplier is required to use a form in substantial compliance with Iowa Code section 537B.3(1).

But, if the customer authorizes repairs orally, the supplier is required to inform the customer of "the right to receive a written or oral estimate." *Id.* § 537B.3(3). Then, the supplier is required to "note the consumer's response on the form described in subsections 1 and 2." *Id.* "If the consumer requests an estimate, the supplier shall provide the estimate to the consumer prior to" the commencement of any work. *Id.*

Here, the Pollers do not claim there was a written acceptance under Iowa Code section 537B.3(1) but instead seek to bring the case within the "oral acceptance" provision by asserting that where there is no written authorization, the provisions related to oral acceptance should apply. *Id.* § 537B.3(3).

We think the Pollers provide the best approach to the statute. The statute divides authorizations into two categories: written and oral. They

are designed to create a binary world of authorization and not to permit an exception for a third category of authorization, namely, authorization by conduct.[1]  Further, we note that OCC in its pleadings admitted the existence of an oral contract between the parties for the restoration of the vehicle.

In any event, we think that subsection 3 has been violated under either interpretation.  If the requirements of subsections 1 and 2 related to written authorizations apply to oral authorizations as well, it is clear that the Pollers were not presented with two material disclosures.  First, they were entitled to have the opportunity to cap costs without further authorization.  Second, they were entitled to an estimated completion date.  It is undisputed that these requirements were not met by OCC.

And, even if we interpret subsection 3 as having its own distinct requirements for oral authorizations, OCC still has not complied with the statute.  Based on the district court's finding of fact, we conclude that the Pollers were not given an estimate for the work.  In fact, the opposite

---

[1]There is a question of whether there is a substantive difference in the terms of subsections 1 and 3 under Iowa Code section 537B.3.  For example, under subsection 3, if the consumer requests an estimate, "the supplier shall provide the estimate to the consumer prior to commencing the repairs or service."  Iowa Code § 537B.3(3).  There is no express provision in subsection 3 for an hourly rate and cost of materials type response.  *Id.*  And, while subsection 3 provides that a supplier shall note the response of the consumer on a form described in subsections 1 and 2 of the statute, the "response" seems to refer to the prior sentence in the subsection, which requires only that the supplier notify a consumer of the right to an estimate.  *Id.*  Thus, subsection 3 does not expressly require that a supplier give the consumer the option of "Call me if repairs and service will be more than $.........................."  *Compare id.* § 537B.3(3), *with id.* § 537B.3(1).  Nor does subsection 3 expressly require that the consumer be provided with "[t]he reasonably anticipated completion date."  *Compare id.* § 537B.3(3), *with id.* § 537B.3(2)(*a*)(4).  Yet, the requirement that the consumer's response be recorded on a form similar to that used for written authorizations may imply that these are additional requirements.  While OCC does contend that authorizations by conduct are excluded from the statute, it does not argue that the authorization here is oral in nature and that the substantive disclosure rights under the statute differ between oral and written contracts.  For the purpose of this case, we assume that the disclosure requirements for oral and written authorizations are the same.

occurred.  But, if an estimate is requested, as it was here, subsection 3 imposes on the supplier an unqualified obligation to "provide the estimate to the consumer prior to commencing the repairs or service."  Iowa Code § 537B.3(3).  In this case, Deb Poller clearly requested an estimate, but OCC did not provide it.

We do not regard the failure to comply with the disclosure requirements of subsection 3 as an inconsequential violation.  As noted in *Sprenger v. Trout,* "The significance of the automotive repair regulations is to prevent a situation where the consumer is presented with a final bill that far exceeds the anticipated cost of repairs."  866 A.2d at 1042.  That is exactly what occurred here.  A violation of the provision related to estimates "goes to the very essence of what the regulations are designed to accomplish."  *Id.*  Or, as stated by another court, failure to comply with the statute "created the climate for the dispute that ultimately developed." *Scibek*, 770 A.2d at 1249.  Indeed, in this case, if OCC had complied with the requirements of subsection 3, the parties would likely have mutually come to grips with the overall cost issues prior to the provision of over $100,000 in restoration services.

For the above reasons, we find that OCC violated Iowa Code section 537B.3 under all interpretive alternatives.  We recognize that in light of the nature of its business, OCC may find it difficult to provide prerepair estimates.  But OCC has a path to statutory compliance that accommodates practicalities by insisting that all authorizations for restoration be made in writing.  Under the statute, when repair authorizations are made in writing, OCC may decline to provide an estimate, but it must specifically provide in writing an opportunity for the customer to set a limit on expenditures that may be incurred without prior

approval and provide the information provided in subsection 2, including an estimated completion date. *See* Iowa Code § 537B.3(1), (2).

**C. Violation of Iowa Code Section 537B.6(3) (Cost Exceeding Estimates).**

1. *Positions of the parties.* The Pollers claim that OCC violated Iowa Code section 537B.3 by not informing them of their right to an estimate and not providing an estimate when requested by Deb. In the alternative to their claim that they were not provided with an estimate as required by chapter 537B.3, they claim they were provided with an estimate of $45,000 but that OCC exceeded the estimate by more than ten percent without obtaining further authorization from them. Such conduct would amount to an unfair practice under Iowa Code section 537B.6(3). OCC responds that the district court determined that OCC did not, as a matter of fact, provide a $45,000 cost estimate and that this factual determination is fatal to the Pollers' claim here.

2. *Discussion.* We see no reason to disturb the district court's factual finding that the Pollers were not given an estimate. The district court found that the Pollers claim was against the weight of the evidence. Such findings are left undisturbed if there is substantial evidence, as there is here, to support it. *Grinnell Mut. Reins. v. Voeltz*, 431 N.W.2d 783, 785 (Iowa 1988). If there was no estimate, the Pollers were not improperly charged for repairs that exceeded the estimate by ten percent. As a result, we find no violation of Iowa Code section 537B.6(3).

**D. Violation of Iowa Code Section 537B.6(5) (Disassembly and Reassembly).**

1. *Position of the Pollers.* Iowa Code section 537B.6(5) provides that a supplier shall not fail to disclose to the customer "prior to the commencement of any repairs or service" charges for "disassembly,

reassembly, partially completed work, or any other work not directly related to the actual performance of the repairs or service." On appeal, the Pollers present to us a matrix of charges from invoices with descriptions of work that they claim are within the scope of subsection 5. The total amount of charges that the Pollers claim required advance authorization is $6516.25.

2. *Position of OCC.* OCC responds by noting that the district court found that "each and every task" performed by OCC was authorized. If this factual finding is correct, OCC argues, then there is no basis for the Pollers' claim under Iowa Code section 537B.6(5).

3. *Discussion.* Based on the record at trial, we conclude that OCC did not get *preapproval* for charges for "disassembly, reassembly, . . . or any other work not directly related to the actual performance of the repairs." *Id.* Further, there is no question that the record shows that there was considerable correspondence between the Pollers and OCC about the restoration, including specific approval of engine parts, gas tanks, the radiator, and paint. But the question here is a narrow one: Did OCC get permission *in advance* for reassembly, disassembly, and other work not related to the restoration of the car? The answer to this narrow question is no and, as a result, a violation of the statute occurred.

**E. Violation of Iowa Code Section 537B.6(6) (Unauthorized Repairs).**

1. *Position of the Pollers.* Iowa Code section 537B.6(6) provides that it is a deceptive act or practice for a supplier to "[c]harge for any repair or service which has not been authorized by the consumer." The Pollers claim that OCC engaged in unauthorized repairs by marking up the cost of materials they obtained for the restoration project by thirty percent before billing the Pollers. They further claim that OCC charged for shop

supplies and disposal of hazardous material. The Pollers also claim that OCC performed a "show quality" restoration and that such services involved extra work and charges. Finally, the Pollers assert that they never agreed to storage charges assessed by OCC after the billing dispute arose.

2. *Position of OCC.* OCC generally asserts that the record shows the Pollers approved "numerous modifications and change orders to the original scope defined in December [of] 2013." Therefore, OCC generally claims that all of the charges on its invoices were "authorized."

On the specific claim that the thirty percent markup of materials violated the MVSTPA, OCC notes that it told the Pollers that it would charge "$65.00 per hour plus materials" for the restoration work. This statement, according to OCC, did not bind it to charge for materials at wholesale cost. Further, OCC points out, both Linn and Torrence testified that such markups were customary in the automobile industry for sellers who purchase parts at wholesale. OCC also notes that it did not hide the practice of marking up supplies and parts. Specifically, in an email sent to the Pollers on August 1, 2014, OCC noted it had found a new core and rebuilt radiator for "$2080 and we will not be marking it up for you."

On the issue of "show quality," OCC notes that Denny Linn testified that show quality is the only kind of service performed by OCC. Further, OCC points to an August 21, 2014 email from Linn to the Pollers noting that the "[f]ront fenders have been color sanded and buffed. Again, it takes a lot of time, but show quality when finished." Further, OCC notes that whenever OCC presented the Pollers with a choice between a cheaper or higher quality item, the Pollers always chose the more expensive item. In any event, OCC argues that Iowa Code section 537B.6(6) requires only that "repairs or service" be authorized and that whether or not a restoration is "show quality" is simply not relevant.

3. *Discussion.* We begin with consideration of the lawfulness of the thirty percent markup by OCC. Here, OCC made it clear to the Pollers that it would be billing them based on labor charges and "materials." There is nothing in the record to suggest that OCC said anything about the method that OCC would use to price the materials. An automobile repair service is ordinarily in the business of selling parts to consumers, as well as providing services. The notion that a supplier would markup materials provided to the consumer is not a surprising notion and appears to be a standard practice in the automobile restoration industry. If the Pollers were concerned about the pricing of materials, they could have simply asked how charges for materials would be calculated. Under the facts and circumstances presented here, we decline to find a violation of Iowa Code section 537B.6(6) based on the thirty percent markup.[2]

On the question of charges for shop supplies and disposal of hazardous materials, we also do not find a violation of the statute. The Pollers failed to show at trial that the shop supplies and disposal of hazardous waste charges were not tied to the actual performance of repairs. As a result, since the general restoration was authorized and the Pollers have not shown that the charges for shop supplies and disposition of hazardous materials was not directly related to the authorized restoration project, we decline to find a deceptive act or practice under the MVSTPA.

The Pollers finally claim that they did not realize that the services would produce a "show quality" vehicle. We think that the Pollers' claim fails on the record presented. The evidence shows that OCC only

_____

[2]Our ruling here demonstrates the importance of the requirements of Iowa Code section 537B.3 at the beginning of the transaction which help ensure that the consumer and the supplier understand the nature of the costs and the limits of the transaction.

performed "show quality" restorations and the Pollers, who were in the shop itself in December 2013, had an opportunity to view the work being performed there. The expenses that the Pollers point to as being unauthorized show quality relate largely to the painting of the vehicle. But when Linn in the August 21, 2014 email relating to the painting of a fender specifically mentioned "show quality," there was no objection from the Pollers. We decline to find a deceptive practice related to the restoration of the car based on "show quality" under the record developed in this case.

Finally, there is the issue of storage costs. These arise not from the restoration project itself but arise out of an artisan lien apparently asserted by OCC under Iowa Code section 577.1. We do not regard these charges as arising from the restoration itself but rather from a subsequent payment dispute. We do not find a violation of the MVSTPA as the charge is not related to the repair or restoration but to the subsequent legal battle between OCC and the Pollers over the payment of bills. In any event, the Pollers have not been damaged, as they have not paid the storage charges. As will be seen below, because we conclude that the Pollers do not owe any further amounts to OCC, OCC is not entitled to its lien and is not entitled to receive storage charges arising from it.

**F. Violation of Iowa Code Section 537B.6(12) (Materially and Intentionally Mislead as to the Cost of Repairs).** Iowa Code section 537B.6(12) prohibits a supplier from "[m]aterially and intentionally understat[ing] or misstat[ing] the estimated cost of the repairs." Because the district court's finding that OCC did not provide the Pollers with a $45,000 estimate is supported by substantial evidence, we decline on appeal to find a violation of this provision of the MVSTPA.

**G. Summary.** We find that OCC violated Iowa Code section 537B.3 by failing to inform the Pollers of the right to an estimate and section

537B.6 by failing to obtain preapproval of charges related to disassembly and reassembly. We reject the balance of the Pollers' MVSTPA claims.

## VI. Impact of MVSTPA Violations on Enforceability of OCC's Breach of Contract Counterclaim.

**A. Overview.** We now turn to the question of whether the MVSTPA violations affect the enforceability of OCC's contract with the Pollers. The district court found a contract existed based on the terms of the November 6, 2013 email stating that charges for the project would be $65 an hour plus materials. The Pollers raise a number of issues related to formation of the alleged contract.[3] In addition, the Pollers claim that because the contract was formed in violation of the provisions of the MVSTPA, OCC may not enforce the illegal contract. Because it is dispositive, we focus on the enforceability of the contract in light of the violations of the MVSTPA.

**B. Positions of the Parties.**

1. *Position of the Pollers.* The Pollers claim that OCC cannot succeed on a breach of contract claim because "[i]t is illogical and against clear public policy to allow OCC to collect for monies it attempted to earn in violation of a consumer protection statute." The Pollers note that under Iowa law, contracts made in contravention of a statute are void and unenforceable. *Bank of the W. v. Kline*, 782 N.W.2d 453, 462–63 (Iowa

---

[3]The Pollers claim that OCC breached the contract with the Pollers when it failed to provide monthly invoices. Further, the Pollers claim there was no meeting of the minds regarding the work to be done as the Pollers did not agree to "show quality" of the restoration effort and to other aspects of OCC's billings. Finally, the Pollers claim OCC represented that the cost of completion should be no more than $45,000 and, in any event, they certainly were not notified that their bill would be in excess of $100,000. Based on our review of the record, and our deference to the findings and credibility determinations of the district court, we conclude that the Pollers at trial failed to show that the monthly invoices were part of a bargained-for contract, that the parties failed to agree on the issue of "show quality," and that OCC promised that the cost of the project would not exceed $45,000. As a result, the Pollers' breach of contract claim fails.

2010) (holding that violations of Equal Credit Opportunity Act render void any obligations made in contravention of the act); *Milholin v. Vorhies*, 320 N.W.2d 552, 554 (Iowa 1982) (en banc) (holding that a violation of rules of the Iowa Real Estate Commission render oral listing agreement invalid).

The Pollers draw support from the Florida case *Osteen v. Morris*, 481 So. 2d 1287, 1290 (Fla. Dist. Ct. App. 1986). In *Osteen*, the court considered a violation of the right to an estimate under a statute similar to Iowa's MVSTPA. *Id.* at 1288. The *Osteen* court concluded that the purpose of the statute was "to protect consumers against misunderstandings arising from oral estimates of motor vehicle repairs and the legal disputes and litigation that result from the 'fait accompli' nature of claims for repair work already done." *Id.* at 1290. The Pollers also cite a Wisconsin court of appeals case holding that when a repair shop takes money from a consumer after violating the law, in that case repairing without authorization from the consumer, then the repair shop is not entitled to payment for the repairs. *Kaskin*, 767 N.W.2d at 403.

2. *Position of OCC.* OCC argues that even if it violated chapter 537B, there was still a valid underlying contract. OCC contends that an agreement to perform services on a time and materials basis is a valid agreement. *Welter v. Heer*, 181 N.W.2d 134, 136 (Iowa 1970). OCC argues that it provided quality restoration work under the contract and that expert testimony from the Pollers' own witness indicated that the final product was in excellent condition and the restoration work would have cost in excess of $100,000. OCC also argues that unlike some state legislatures, Iowa has not created a "strict liability" statute within Iowa Code chapter 537B that would prohibit charges for services rendered in violation of chapter 537B. OCC argues that the legislative intent,

evidenced by not creating a strict liability rule, indicates that the Pollers' public policy argument is not valid.

OCC notes that one of the Pollers' main arguments under chapter 537B is that they were not provided with an estimate, which would have given them an option to put a cap on the project's expenses. But, OCC argues that the Pollers had the chance to opt out of the contract after the $45,000 expended that they alleged was their cap because in August 2014, the Pollers received invoices totaling $49,560.27 and at the time of receiving the invoices, also received an email from Denny offering the Pollers to set aside their Chevy in a warehouse if the Pollers were not happy with the arrangement.

3. *Discussion.* There are a number of cases from other jurisdictions that provide that where a supplier does not provide a written estimate, the underlying contract is not enforceable. Many of the cases, however, involve statutes that directly answer the difficult question of what to do when a supplier provides quality work but did not provide an estimate required by law.

For instance in *Webb v. Ray*, a state of Washington appellate court considered a case where the statute provided that "[t]he repairman may not charge for work done or parts supplied which are not a part of the written price estimate." 688 P.2d at 536. The *Webb* court concluded that because there was no written estimate, the repairer was not entitled to enforce the underlying contract. *Id.* at 537. Similarly, in *I-5 Truck Sales & Serv. Co. v. Underwood*, the court held that where no written estimate was given, the contract could not be enforced. 645 P.2d 716, 720 (Wash. Ct. App. 1982).

A California appellate court took a similar path in *Schreiber v. Kelsey*, 133 Cal. Rptr. 508. In *Schreiber*, the statute provided that "The

automotive repair dealer shall give to the customer a written estimated price for labor and parts necessary for a specific job and shall not charge for work done or parts supplied in excess of the estimated price." *Id.* at 509 (quoting Cal. Bus. & Prof. Code § 9884.9 (1973)). The *Schreiber* court concluded that the "section bars recovery . . . done in the absence of a written estimated price for labor and parts." *Id.* Further, the court in *Schreiber* held that subsequent oral authorizations were not enforceable in light of the lack of the written estimate required by statute. *Id.* The *Schreiber* court noted that if subsequent oral authorization were permitted, the statute could be easily avoided in every case. *Id.*

A third case of interest is *Brooks v. R.A. Clark's Garage, Inc.*, 378 A.2d 1144 (N.H. 1977). In *Brooks*, the statute declared:

> Every repairman who agrees to perform any repair on a customer's motor vehicle shall give to such customer a written estimated price for labor and parts necessary for such repair. No work shall be done and no charges shall accrue before authorization to proceed is obtained from the customer.

*Id.* at 771 (omission in original) (quoting N.H. Rev. Stat. Ann. § 269:8 (Supp. 1975)). The *Brooks* court held that where a repairer entered into an illegal contract by not providing a written estimate, the party could not recover on principles of contract or quasi-contract. *Id.* at 771–72.

The Iowa version of the MVSPTA does not provide express instruction of whether a contract entered in violation of section 3 may be enforced. To that extent, our situation is somewhat different from the situations in *Webb*, *I-5 Truck Sales*, *Schreiber*, and *Brooks*. But there is authority for the proposition that express statutory language of the unenforceability of an illegally formed contract is not required.

In *Huffmaster v. Robinson*, the court considered a case where a written estimate of price was not provided. 534 A.2d 435, 437 (N.J. Super.

Ct. Law Div. 1986). Although the New Jersey statute was silent on the effect of the omission on the underlying contract, the New Jersey court concluded that the act "must be read as depriving a technically violating repairman of any enforcement capacity." *Id.* at 439. Otherwise, declared the New Jersey court, "the act would make no sense." *Id.*

The same type of reasoning was employed in *Osteen v. Morris*, 481 So. 2d 1287. In *Osteen*, a customer orally authorized a repair but the statute required a written estimate or a written notice of the right to a written repair estimate. *Id.* at 1288. The *Osteen* court held the contract was not enforceable. *Id.* at 1290. According to the *Osteen* court, "if the customer is held legally liable when the shop has disregarded the provisions of the statute, the shop could effectively disregard the intention of the legislature as evidenced by the provisions of this act." *Id.* at 1289.

The result in the above cases has not been without controversy. For instance, in the state of Washington, the legislature amended the statute after the *Webb* and *I-5 Interstate* cases to permit the supplier to recover the reasonable value for work performed and parts supplied. *Clark v. Luepke*, 809 P.2d 752, 754–55 (Wash. Ct. App. 1991). In another case, a Maryland appellate court held that a failure to give notice of customer rights did not excuse the customer from paying for services rendered which were necessary and furnished at a reasonable cost. *Rogers Refrigeration Co. v. Pulliam's Garage, Inc.*, 505 A.2d 878, 884 (Md. Ct. Spec. App. 1986).

The precise question here on the breach of contract claim, then, is not whether the Pollers suffered an ascertainable loss under the MVSTPA, but is whether a contract which is illegally formed may be enforced by OCC. While the court of appeals conflated these two issues, they are separate and distinct.

On the separate and distinct issue of whether OCC may enforce the illegally formed contract in violation of Iowa Code section 537B.3, we think the better view is that the illegal contract cannot be enforced. Otherwise, as suggested by *Huffmaster* and *Osteen*, the salutary terms of the statute would not be enforceable and could easily be evaded. The salutary purpose of the statute, namely, to clearly establish and document likely expenses in the auto repair business, would be severely undermined by a contrary rule. Our approach in this case is consistent with other commercial cases where we have held that illegal contracts are not enforceable. *See, e.g., Kline,* 782 N.W.2d at 461 (holding the violation of the Equal Credit Opportunity Act was an affirmative defense in an action to collect on debt).

We recognize that our conclusion may yield a degree of unfairness to OCC. By all accounts, the work performed on the Pollers' vehicle was excellent. But as noted by the *Osteen* court, "We do not suggest that the result in this case is fair to the shop. We only agree with the trial court that this result appears to be mandated in this case by the statute." 481 So. 2d at 1290.

We too agree that in order to give section 3 teeth, a contract formed in violation of the provision is not enforceable. As a result, the district court erred in awarding OCC damages based on its breach of contract claim in this case.

**VII. Remedies Available in Light of Rulings on MVSTPA and Breach of Contract Claims.**

**A. Overview.** In light of our ruling on the contract issue, we now consider whether the Pollers are entitled to damages under the MVSTPA. The MVSTPA does not have a section on remedies. Instead, violations of the MVSTPA are unfair practices under the Iowa Consumer Fraud Act.

*See* Iowa Code § 714.16(2)(*k*). Thus, in order to recover damages for violations of the MVSTPA, a plaintiff must meet the requirements of the Iowa Consumer Fraud Act for damages.

Under the Iowa Consumer Fraud Act, " '[*a*]*ctual damages*' means all compensatory damages proximately caused by the prohibited practice or act that are *reasonably ascertainable* in amount." *Id.* § 714H.2(1) (second emphasis added). A consumer who suffers actual damages may bring a claim under Iowa Code section 714H.5(1). Even if the Pollers have proven violations of the MVSTPA, the question arises whether the Pollers have made the required damage showing in this case, particularly in light of our holding that OCC may not enforce the contract to collect the balance it claims the Pollers owe.

**B. Damages: The Issue of Ascertainable Loss.** The Pollers claim that they have established the requirements for a private cause of action under Iowa Code section 714H.5. The Pollers argue that they have demonstrated an ascertainable loss in both money and property because of OCC's violations of Iowa Code chapter 537B.

On the question of ascertainable loss, the Pollers cite the Washington cases. In these cases, the Washington courts held that contracts formed in violation of MVSTPA-type statutes are unenforceable. *I-5 Truck Sales & Serv. Co.*, 645 P.2d at 720; *Webb*, 688 P.2d at 537. Because the Pollers have paid $45,000 under a contract that is invalid, the Pollers are seeking a full refund of the amounts they have paid as part of the restoration effort. In the alternative, the Pollers seek a credit against the balance owed by the Pollers to OCC for unauthorized charges.[4]

---

[4]OCC does not directly address the damage issue in its appellate brief.

We briefly addressed the term "ascertainable loss" in *McKee v. Isle of Capri Casinos, Inc.*, 864 N.W.2d 518, 532 (Iowa 2015). In *McKee*, we considered a case where a patron of a casino believed she had won in excess of what the rules of the game, which provided contractual rights, allowed for. *Id.* at 520. The claim was based on an alleged breach of contract. *Id.* at 526–32. We determined that the consumer fraud claim failed because "[i]f McKee had no contractual right to the bonus, and we have already determined she did not, then she could not have suffered an ascertainable loss of money or property when she was denied that bonus." *Id.* at 532.

Several other jurisdictions provide additional guidance for understanding the term "ascertainable loss" in the context of violation of a consumer protection statute. The Supreme Court of Connecticut has determined that something is ascertainable when it is "capable of being discovered, observed or established" and that loss is "synonymous with deprivation, detriment and injury." *Hinchliffe v. Am. Motors Corp.*, 440 A.2d 810, 814 (Conn. 1981). Therefore, the court determined that "[w]henever a consumer has received something other than what he bargained for, he has suffered a loss of money or property. That loss is ascertainable if it is measurable even though the precise amount of the loss is not known." *Id.* The Supreme Court of Tennessee has determined that an "ascertainable loss" must be "measurable," *Discover Bank v. Morgan*, 363 S.W.3d 479, 496 (Tenn. 2012), and "have tangible economic value." *Akers v. Prime Succession of Tenn., Inc.*, 387 S.W.3d 495, 509–10 (Tenn. 2012). Another court has stated that "ascertainable loss" is getting something less than you bargained for and encompasses more than economic harm. *Simonsen v. Sandy River Auto, LLC*, 413 P.3d 982, 985 (Or. Ct. App. 2018).

The Pollers claim that OCC's violations of section 3 of the MVSTPA meant the Pollers did not receive a document indicating the reasonably anticipated completion date or allow them to set a budgetary cap on the project under subsections 1 and 2 or, in the alternative, they did not receive a written estimate, under subsection 3. We have also found that certain charges for assembly and disassembly were subject to prior approval, which did not occur, in violation of section 6 of the statute.

While OCC has undoubtedly failed to comply with the provisions of the MVSTPA, the Pollers have not demonstrated a reasonably ascertainable loss caused by OCC's failings, particularly in light of our holding that OCC cannot seek to enforce the contract to collect the balance of the amount it claims the Pollers owe them. The Pollers have paid OCC a total of $45,000. The testimony makes it clear that the Pollers in fact expected to pay up to $45,000 for the restoration services. In light of our holding on the lack of enforceability of the underlying contract, there is no showing that they would have paid less than this amount had OCC complied with all of the provisions of the MVSTPA.

We also conclude that the Pollers have no ascertainable loss for the violation of Iowa Code section 537B.6(5). While OCC did not obtain preapproval for covered charges, the Pollers made no persuasive showing that they would not have approved the charges in advance if given the opportunity to do so.

We now address the question of whether the Pollers are entitled to a refund of the $45,000 paid to OCC. Although we have found the contract illegal and unenforceable, we do not find that the Pollers are entitled to a return of their payments to OCC. Such payments were voluntarily made and show acquiescence in the underlying violations at least to the extent of payments made. Further, the course of conduct in paying three

additional payments after they received the invoices on August 6 and thereafter were clearly relied upon by OCC when it continued to work on the car. Under the circumstances, permitting the Pollers to, in effect, disown the payments would be inequitable. *See Scibek*, 770 A.2d at 1250 (discussing application of estoppel to prevent unjust results in auto repair context). Further, while we have concluded that the MVSTPA may be a shield to protect a customer from enforcement of an illegal contract, we are not prepared under the circumstances here to permit the Pollers to use the MVSTPA as a sword when they have no ascertainable loss. *Id.* at 1249.

OCC has retained possession of the Pollers' auto. There might be some economic value in being deprived of the use of the auto. The Pollers, however, made no showing of such damage at trial. Further, on appeal, the Pollers do not argue damages based on the retention of the car. Under the circumstances, we see no basis for an award of damages based on the lost possession of the vehicle.

While we decline to award damages to the Pollers for the car, we do conclude they are entitled to full possession and ownership of the vehicle. While OCC held possession of the car by claiming a lien for unpaid charges, we have determined that the charges cannot be enforced. As a result, there is no basis for the lien. Therefore, the Pollers are entitled to their vehicle.

**C. Exemplary Damages.** The Pollers seek exemplary damages under Iowa Code section 714H.5(4). They claim that OCC has been in business for many years and has a policy of not providing estimates to consumers seeking work performed. Such conduct, according to the Pollers, demonstrates "willful and wanton disregard for the rights or safety of another." OCC did not directly address the issue in its appellate brief.

We have found that there is no ascertainable loss arising from the violations of the MVSTPA in this case. As a result, there are no exemplary damages. In any event, the questions of coverage decided in this case are questions of first impression in Iowa. We cannot conclude that the actions of OCC amount to willful and wanton disregard of the rights of their customers sufficient to support an award of exemplary damages.

**D. Injunctive Relief.** Under Iowa Code section 714H.5(1), a party may seek equitable relief as the court deems necessary to protect the public from further violations, including temporary and permanent injunctive relief. We see no basis for injunctive relief in this case. The restoration project is now complete. We have decided issues of first impression in this case. There is no basis to believe that OCC will continue the practices that we have found unlawful in this case.

**E. Entitlement to Attorney Fees.** Under Iowa Code section 714H.5(2), attorney fees may be awarded if a person has violated the chapter and the consumer "is awarded actual damages." Here, although we have found a violation of the Iowa Code chapter 537B, we have awarded no damages. As a result, the Pollers are not entitled to attorney fees in this action.

**VIII. Conclusion.**

For the forgoing reasons, we determine that OCC violated several provisions of Iowa Code chapter 537B. As a result, OCC may not seek to enforce the terms of a contract that was formed in violation of Iowa law. The Pollers, however, did not establish actual damages arising from the alleged violations and, as a result, are not entitled to affirmative relief.

Therefore, the decision of the district court is affirmed in part and reversed in part. To the extent the district court held that the Pollers are not entitled to recover under their claims, the result is affirmed. The

judgment in favor of OCC on the counterclaim is reversed. As a result of our holdings, OCC has no basis for a possessory lien on the vehicle and the Pollers are entitled to possession of it. The matter is remanded to the district court with instructions to enter judgment dismissing OCC's breach of contract claim and to enter any such other orders as necessary to implement the holdings in this opinion.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.**