Randy W. KASKIN, Plaintiff-Appellant,

v.

JOHN LYNCH CHEVROLET-PONTIAC SALES, INC.,
a Wisconsin corporation, Defendant-Respondent.

Court of Appeals

*No. 2008AP1199. Submitted on briefs March 5, 2009.
—Decided April 29, 2009.*

2009 WI App 65

(Also reported in 767 N.W.2d 394.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Vincent P. Megna* and *Susan M. Grzeskowiak* of *Jastroch & Labarge, S.C.* of Waukesha.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Jeffrey Leavell* and *Anissa M. Boeckman* of *Jeffrey Leavell, S.C.* of Racine.

A nonparty brief was filed by *Paul R. Norman* and *M. Tess O'Brien-Heinzen* of *Boardman, Suhr, Curry & Field, LLP* for Wisconsin Automobile & Truck Dealers Association.

A nonparty brief was filed by *John S. Green*, assistant attorney general, and *J.B. Van Hollen*, attorney general, for the Wisconsin Department of Justice.

A nonparty brief was filed by *Sarah J. Orr* for the *University of Wisconsin Law School Consumer Litigation Clinic*.

Before Brown, C.J., Anderson, P.J., and Snyder, J.

¶ 1. BROWN, C.J. This case concerns that part of our consumer protection law dealing with unauthorized motor vehicle repair. WISCONSIN ADMIN. CODE § ATCP 132.09(1), (4)(e) (Oct. 2004)[1] states, in pertinent part, that "[n]o shop may . . . [d]emand or receive payment for unauthorized repairs, or for repairs that have not been performed." We hold that a major purpose of this provision is to prevent either unexpected repairs, unexpected expense or both. Therefore, if the work done here was unauthorized, then the harm to the consumer, Randy W. Kaskin, was that he was deprived of his prescribed right to be informed and his concomitant right to consent or refuse consent. The remedy for a

---

[1] All references to the WIS. ADMIN. CODE ch. ATCP 132 are to the October 2004 version unless otherwise noted.

violation of this right is that the repair shop must forego being paid, even if the shop did, in fact, satisfactorily repair the vehicle.

¶ 2. In so holding, we reject the theory of the repair shop, Lynch Chevrolet in this case, that "pecuniary loss" as the term appears in WIS. STAT. § 100.20(5) (2007–08)[2] means the amount the consumer can prove he or she paid, either to the repair shop or to another repair shop, to correct a bad repair job done by the shop being complained against. That circumstance has nothing to do with unexpected repair or expense and everything to do with faulty repair—which is not the mischief the rule was designed to prevent. Consumers do not need § 100.20(5) to bring a cause of action for a bad repair job. They can avail themselves of common law remedies for faulty repair. And we also reject Lynch's alternative theory that the measure of "pecuniary loss" is the difference between the amount the motor vehicle owner was forced to pay to get the car back and the lesser amount the owner can prove would have been paid had the owner been so informed and gone somewhere else to get the repair done. Because the circuit court adopted Lynch's primary position at summary judgment, and in so doing, held that the disputed fact about authorization was immaterial, and because the issue of authorization otherwise remains disputed, we reverse and remand with directions that the authorization issue be tried.

¶ 3. In August 2006, Kaskin bought a brand new 2007 Chevrolet Silverado truck. That November, after about 3300 miles, the engine started knocking. Eventually, Kaskin had his truck towed to Lynch and ex-

---

[2] All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

plained via telephone to an assistant service manager that something was wrong with his truck. The next day, Kaskin spoke in person with the assistant service manager at Lynch, who gave him a repair order that provided a preliminary estimate of one penny because Lynch assumed the truck was under warranty.

¶ 4. Kaskin claims that Lynch did not request any authorization from him to diagnose or inspect the vehicle. He further claims that, to the extent he authorized any investigation or repairs, it was only with the understanding that whatever needed to be fixed was under warranty. However, Lynch claims that Kaskin not only requested investigation and nonwarranty repair, he demanded it and authorized it. Here is the disputed fact that the trial court will have to address on remand.

¶ 5. About a week after dropping his truck off, Kaskin got a call from Lynch that his truck was done. Kaskin got some good news from Lynch: they fixed his truck. The truck had bad fuel in the fuel tank and the fuel had ruined the engine injectors. Lynch replaced all eight injectors and the truck now ran smoothly. Kaskin also got some bad news: he now owed Lynch almost $5000. Kaskin protested because he thought it was a warranty repair. But Lynch would not give Kaskin his truck back until he paid the bill, so Kaskin paid.

¶ 6. Outraged that he had to pay a bill for a repair that he had assumed was under warranty, Kaskin filed an action under WIS. STAT. § 100.20(5) claiming that since he never authorized any nonwarranty repairs, Lynch violated WIS. ADMIN. CODE ch. ATCP 132. Lynch moved for summary judgment and the circuit court denied the motion because the parties disputed a material fact: whether Kaskin had authorized the repairs at his expense. On reconsideration, Lynch asserted that

807

authorization was immaterial, contending that Kaskin did not suffer a pecuniary loss because of Lynch's alleged violation. Lynch explained to the circuit court that it did not cause Kaskin's truck to need engine repair and Kaskin paid a fair price for a proper repair that fixed his truck. The circuit court agreed, holding that the engine problems were caused by bad fuel and not Lynch's alleged failure to obtain Kaskin's authorization. Therefore, the circuit court concluded that the authorization issue was immaterial because Kaskin did not suffer a pecuniary loss, or at least not a pecuniary loss caused by the lack of authorization.

¶ 7. On appeal, Kaskin asserts that the circuit court erred in its interpretation of pecuniary loss in WIS. STAT. § 100.20(5). He argues that the term "pecuniary loss," as it appears in the statute, means the amount a customer has to pay a repair shop for unauthorized motor vehicle repairs performed in violation of WIS. ADMIN. CODE ch. ATCP 132. Therefore, Kaskin contends, his pecuniary loss was the almost $5000 he paid to Lynch.

¶ 8. We review the circuit court's decision to grant summary judgment de novo. *Snyder v. Badgerland Mobile Homes, Inc.*, 2003 WI App 49, ¶ 7, 260 Wis. 2d 770, 659 N.W.2d 887. The standard of review for summary judgment is well known and we will not repeat it here except to say that summary judgment is reserved for cases where the issue to be resolved is a pure question of law and is not appropriate when there is a genuine issue of material fact. *Id.*, ¶ 8.

¶ 9. Kaskin's appeal requires us to interpret the meaning of "pecuniary loss because of a violation" as used in WIS. STAT. § 100.20(5). Section 100.20(5) states:

(5) Any person suffering pecuniary loss because of a violation by any other person of any order issued under

this section may sue for damages therefor in any court of competent jurisdiction and shall recover twice the amount of such pecuniary loss, together with costs, including a reasonable attorney's fee.

This language provides a private remedy for consumers who fall victim to the unfair methods of competition and trade practices prohibited by, inter alia, general orders of the Department of Agriculture, Trade and Consumer Protection promulgated under § 100.20(2). In other words, § 100.20(5) "supplies the teeth" to the DATCP orders. *Benkoski v. Flood*, 2001 WI App 84, ¶ 16, 242 Wis. 2d 652, 626 N.W.2d 851.

¶ 10. The forbidden trade practice at issue in this case is found in Wis. Admin. Code ch. ATCP 132. Chapter ATCP 132 is entitled motor vehicle repairs and its sections explain the information motor vehicle repair shops must provide to customers and the customer authorization shops must obtain before beginning repairs. *See* §§ ATCP 132.02, 132.03. Of particular importance to the case at bar, § ATCP 132.02 says that "[n]o shop may perform any repair that has not been authorized by the customer." It further informs that a shop representative must record the repair authorization on a written repair order as provided by another section of the code. Section ATCP 132.04 outlines the price information that must be given to the customer. We quote this provision in full in a footnote.[3] Suffice it to say, the requirements are clear-cut and stringent.

---

[3] Wisconsin Admin. Code § ATCP 132.04 states as follows:

**ATCP 132.04 Repair price information. (1)** Estimate alternatives or firm price quotation; shop's choice. Before a shop starts any repairs whose total price may exceed $50, a shop representative shall provide the customer with a written statement of estimate alternatives under sub. (2) or a firm price quotationunder sub. (3).

¶ 11. Also relevant is that shops are prohibited from demanding or receiving payment for unauthorized

This requirement does not apply if there has been no face-to-face contact between the customer and a shop representative.

(2) STATEMENT OF ESTIMATE ALTERNATIVES. (a) A statement of estimate alternatives, if provided, shall be conspicuously printed in the following form, either on the repair order or on a separate document attached to the repair order:

"YOU ARE ENTITLED TO A PRICE ESTIMATE FOR THE REPAIRS YOU HAVE AUTHORIZED. THE REPAIR PRICE MAY BE LESS THAN THE ESTIMATE, BUT WILL NOT EXCEED THE ESTIMATE WITHOUT YOUR PERMISSION. YOUR SIGNATURE WILL INDICATE YOUR ESTIMATE SELECTION.

1. I request an estimate in writing before you begin repairs.

_____

2. Please proceed with repairs, but call me before continuing if the price will exceed $ _____ .

_____

3. I do not want an estimate.

_____ "

(b) If the statement of estimate alternatives under par. (a) is printed on a separate document, rather than on the repair order, the separate document shall include the repair order number or other information which uniquely identifies the authorization with the repair order. The shop shall keep a copy of the signed authorization with its records.

(3) FIRM PRICE QUOTATION. (a) A firm price quotation, if provided, shall be written on the repair order and shall be accompanied by the following conspicuous statement on the repair order: "THIS PRICE FOR THE AUTHORIZED REPAIRS WILL NOT BE EXCEEDED IF THE MOTOR VEHICLE IS DELIVERED TO THE SHOP WITHIN 5 DAYS."

(b) A shop may not exceed the firm price quoted under par. (a) for the specified repairs to the vehicle, component, part or accessory, if the customer delivers that motor vehicle, component, part

repairs and refusing to return the customer's vehicle if the customer declines to pay for unauthorized repairs. WIS. ADMIN. CODE § ATCP 132.09(3)(a), (4)(e). For the purpose of determining the meaning of "pecuniary loss because of a violation," we will assume that Lynch required Kaskin to pay for unauthorized repairs before it returned his vehicle, therefore violating ch. ATCP 132.

¶ 12. The construction of statutes and administrative rules and regulations are both questions of law we decide without deference to the circuit court's conclusions. *Moonlight v. Boyce*, 125 Wis. 2d 298, 303, 372 N.W.2d 479 (Ct. App. 1985). The construction of administrative rules is governed by the same principles that apply to statutes. *Huff & Morse, Inc. v. Riordon*, 118 Wis. 2d 1, 4, 345 N.W.2d 504 (Ct. App. 1984), *holding limited on other grounds by Baierl v. McTaggert*, 2001 WI 107, ¶¶ 16–17, 19, 245 Wis. 2d 632, 629 N.W.2d 277. When construing statutes, we aim to discern the legis-

or accessory to the shop within 5 days after the date on which the firm price is quoted.

(c) Notwithstanding sub. (4), a shop is not required to give a customer an estimate for repairs if the shop gives the customer a firm price quotation under par. (a) for those repairs.

(4) ESTIMATE REQUIRED. If any of the following has occurred, a shop representative shall give the customer an oral or written estimate, and shall write that estimate on the repair order before the shop starts any repairs whose total price may exceed $50:

(a) The customer has signed estimate alternative 1 under sub. (2).

(b) There has been face-to-face contact between the customer and a shop representative, but the customer has not signed any of the estimate alternatives under sub. (2).

(c) The shop has accepted any prepayment from the customer.

(d) The customer has requested an estimate before authorizing a repair under s. ATCP 132.02.

lative intent of the statute. *Moonlight*, 125 Wis. 2d at 303. In determining the intent, we look first to the plain language of the statute. *Snyder*, 260 Wis. 2d 770, ¶ 10. If the language is unambiguous we must end our inquiry and give it effect. *Id.* Otherwise, we ascertain the legislative intent by examining the language of the statute and extrinsic evidence to determine the scope, history, context, subject matter and purpose of the statute. *See, e.g., Hughes v. Chrysler Motors Corp.*, 197 Wis. 2d 973, 979, 542 N.W.2d 148 (1996).

¶ 13. Lynch theorizes that, with respect to Wis. Stat. § 100.20(5), the term " 'because of a violation' clearly indicates that there must be causation between Lynch's actions that violate the code and any pecuniary loss suffered by Mr. Kaskin." It contends that the language of § 100.20(5) plainly requires the injured party to prove that the shop caused the need for the repairs, or that the repairs were somehow unnecessary or billed at an excessive rate.

¶ 14. We have no quarrel with the assertion that a violation of the code must "cause" a pecuniary loss to the consumer. In fact, that is exactly what the statute and the code mean to say. The quarrel instead is: how is "pecuniary loss" measured? Both Wis. Stat. § 100.20 and Wis. Admin. Code ch. ATCP 132 are silent as to whether pecuniary loss means the amount the consumer paid for unauthorized motor vehicle repairs. There is also no case in Wisconsin that has analyzed this issue. But, looking at the clear and, in our view, unambiguous language of both the statute and the code, it is apparent to us that the pecuniary loss is precisely the amount the consumer paid for unauthorized repairs. Section 100.20(5) says that "[a]ny person suffering pecuniary loss *because of a violation*" is entitled to

damages pursuant to the statute. (Emphasis added.) And the preamble note to ch. ATCP 132 states, in pertinent part:

> This chapter is adopted under authority of s. 100.20 (2) Stats., and is administered by the Wisconsin department of agriculture, trade and consumer protection. *Violations of this chapter may be prosecuted under s.100.20* . . . A person who suffers a monetary loss *because of a violation of this chapter* may sue the violator directly . . . . (Emphasis added.)

¶ 15. It is our view that the preposition "because of" modifies the verb "suffering" as it appears in the statute and "suffers" as is found in the code. Thus, a consumer "suffers" or is "suffering" because of a violation of the chapter. And since the chapter prohibits unauthorized repairs, it follows that unauthorized repairs make the consumer "suffer." Therefore, using the common understanding of the term "because of," we think that the "monetary" or "pecuniary loss" is clearly the amount suffered to be paid as a result of the violation of the code. There is nothing, either in the statute or the code, which says that the consumer must prove something different. We are constrained from adding words to a statute that are not there. *Fond du Lac County v. Town of Rosendale*, 149 Wis. 2d 326, 334, 440 N.W.2d 818 (Ct. App. 1989).

¶ 16. The case law that we have collected on this subject supports our interpretation of the statute. In *Huff & Morse*, 118 Wis. 2d at 9, we recognized that a major purpose of Wis. Admin. Code ch. ATCP 132 is to prevent repair shops from performing *uncommissioned,* or *unauthorized,* repairs. In that case, we explained that "[s]hops which obtain consent to proceed on spe-

cific repair work have been commissioned to do so. The code was promulgated to prevent shops from proceeding with repairs unless they have received permission to do so." *Huff & Morse*, 118 Wis. 2d at 9. Unsaid, but underpinning our statement was the understanding that by requiring shops to receive permission from the consumer to perform repairs at a certain price, the code was ensuring that consumers have the power to choose whether to have the repair work performed, in the manner and price suggested by the repair shop, or seek other options. In other words, the code promulgated a concept of "informed consent" for the consumer. *See Morris v. Gregory*, 661 A.2d 712, 716 n.4 (Md. 1995) (the purpose of the Maryland consumer protection statute relating to vehicle repair is to inform individuals).

¶ 17. The "informed consent" concept is an integral part of consumer protection law, not only here, but across the nation. Many states have adopted stringent rules regarding motor vehicle repair. *See* Jay M. Zitter, Annotation, *Automobile Repairman's Duty to Provide Customer with Information, Estimates, or Replaced Parts, Under Automobile Repair Consumer Protection Act*, 25 A.L.R. 4th 506 (2008). These states have crafted statutes or rules requiring disclosures by automotive repairers before work is begun, just as this state does. Why? Washington State's automobile repair law provides an answer. Its code "is a consumer protection statute designed to foster fair dealing and to eliminate misunderstandings in a trade replete with frequent instances of unscrupulous conduct." *Bill McCurley Chevrolet, Inc. v. Rutz*, 808 P.2d 1167, 1169 (Wash. Ct. App. 1991).

¶ 18. That same understanding was evident in *Huff & Morse*. Although we did not decide whether pecuniary loss is the amount the customer paid for the unauthorized repairs, it is self-evident that we under-

stood how the disclosure provisions were designed to address problems of unexpected repairs and unexpected charges for repairs. In *Huff & Morse*, the customer did not pay the repair bill or file an action under WIS. STAT. § 100.20(5). *Huff & Morse*, 118 Wis. 2d at 12. Instead, the motor vehicle repair shop sued to compel payment and the customer's defense was that the repair shop did not follow the exact form of consent provided by the code. *Id.* at 5, 8. So, we examined whether the shop could use quantum meruit to compel payment for the repairs even though the shop received oral instead of written authorization, thereby violating WIS. ADMIN. CODE ch. ATCP 132. *Huff & Morse*, 118 Wis. 2d at 10. We held that the shop could recover only the reasonable value of services provided, and only up to the original amount authorized. *Id.* We wrote that, "[t]o allow recovery for an amount in excess of the authorization would be to allow recovery for unauthorized repairs. In situations where the repairs are not authorized, collection under any legal theory is prohibited . . . . [T]here can be no recovery for unauthorized repairs." *Id.* at 10–11. The meaning of this passage was clear then and is clear now. The purpose of the code is to prevent unauthorized repairs. If the repairs are unauthorized, they violate the code. If they violate the code, the repair shop has no legal ground upon which to base a claim.

¶ 19. *Benkoski* further informs. There we explained that courts should liberally construe remedial statutes, such as WIS. STAT. § 100.20(5), to suppress the mischief and advance the remedy that the statute intended to afford.[4] *Benkoski*, 242 Wis. 2d 652, ¶¶ 8, 16. The mischief, as we have said, is repair work done

[4] The Consumer Law Litigation Clinic, in its amicus curiae brief, provided an example of the mischief the legislature sought

without consent of the consumer or at a cost exceeding the repair price information given to the consumer. Therefore, the decision by the circuit court in this case, that the consumer should only be able to get his or her money back if the repairs were no good, ignores two of the basic purposes of the code—combating the mischief of doing work that was unexpected or charging in a manner that was unexpected.

¶ 20. In *Moonlight*, 125 Wis. 2d at 304–05, we examined the meaning of pecuniary loss under WIS. STAT. § 100.20(5) for a violation of WIS. ADMIN. CODE ch. ATCP 134 (unfair residential rental practices). The court held that the landlord violated ch. ATCP 134 by not following the prescribed methods of withholding a tenant's security deposit. *Moonlight*, 125 Wis. 2d at 304. The landlord contended that, even if he violated ch. ATCP 134, the tenant did not suffer a pecuniary loss because the tenant had damaged the apartment and his judgment against the tenant for damages exceeded the amount of the security deposit. *Moonlight*, 125 Wis. 2d at 302–03.

¶ 21. If we followed Lynch's logic, which is similar to the landlord's logic in *Moonlight*, the tenant would

---

to suppress and the importance of the "private attorney general" remedy in WIS. STAT. § 100.20(5):

> [T]he [Consumer Law Litigation Clinic] represented a couple who took their only car to a local repair shop to be fixed. The family was, in the truest sense, one unexpected expense away from financial disaster. The shop performed repair after repair, without pre-authorization or written estimates, until the couple could no longer afford to pay. The shop refused to release the car, despite the couple's payment of hundreds of dollars above the initial "estimate." Without transportation, the husband lost his job, leaving the family on the brink of homelessness. [Under WIS. STAT. § 100.20(5),] [t]hat couple was able to sue for damages, attorney's fees and costs—an impossibility without the mantle of the "private attorney general."

not have suffered a pecuniary loss because the tenant lost his security deposit due to damage he did to the apartment. No damage was caused by the landlord wrongfully withholding the tenant's security deposit. Therefore, under Lynch's theory, the tenant's only pecuniary loss would be the amount attributable to improper repairs or repairs for which the landlord overcharged.

¶ 22. The court in *Moonlight*, however, concluded that the opposite was true. It held that once an administrative code violation was found, the tenant suffers a pecuniary loss under Wis. Stat. § 100.20(5) in the amount of the security deposit, regardless of the amount of damages the landlord may recover on a counterclaim. *Moonlight*, 125 Wis. 2d at 305–06. In fact, the court also held that the tenant's pecuniary loss had to be doubled before the court would offset the tenant's damage award with the landlord's judgment. *Id.* at 306.

¶ 23. A similarly broad interpretation of pecuniary loss was repeated in *Hughes* and *Pliss v. Peppertree Resort Villas, Inc.*, 2003 WI App 102, 264 Wis. 2d 735, 663 N.W.2d 851.[5] In calculating the pecuniary loss under lemon law, the court in *Hughes* concluded that pecuniary loss included the entire purchase price that the business wrongfully retained. *Hughes*, 197 Wis. 2d at 982–83. In so doing, the court rejected the business's argument that the pecuniary loss should be limited to the customer's out-of-pocket expenses. *Id.* at 979. The court in *Pliss* applied a broad interpretation in a situation where the business *received* the customer's

---

[5] In *Pliss v. Peppertree Resort Villas, Inc.*, 2003 WI App 102, ¶ 5, 264 Wis. 2d 735, 663 N.W.2d 851, a customer sued a timeshare resort under Wis. Stat. § 100.20(5) for a violation of Wis. Admin. Code ch. ATCP 121 (1968).

money, instead of retained it. In *Pliss*, the court explained that "the pecuniary loss is ... the money paid for the product that the consumer was improperly induced into buying." *Pliss*, 264 Wis. 2d 735, ¶ 21.

¶ 24. We take away from *Moonlight*, *Hughes* and *Pliss* the following rule: where a general order promulgated by DATCP under WIS. STAT. § 100.20(2) prohibits the retention or receipt of the customer's money, the consumer suffers a pecuniary loss under § 100.20(5) in the amount that was wrongfully retained or received. As applied here, this rule supports our construction of the statute and the code—that when a motor vehicle repair shop receives money from a customer for repairs that the customer did not authorize, or at a price not authorized, the customer's pecuniary loss is the entire amount of the unauthorized charges that the customer paid to the motor vehicle repair shop. A customer filing an action under § 100.20(5) is therefore not required to prove anything except that (1) he or she paid and (2) that payment was for unauthorized repairs or repairs otherwise performed in violation of WIS. ADMIN. CODE ch. ATCP 132.[6]

---

[6] We acknowledge that not every violation of WIS. ADMIN. CODE ch. ATCP 132 amounts to the repairs being unauthorized by the customer. *See, e.g., Huff & Morse, Inc. v. Riordon*, 118 Wis. 2d 1, 10, 345 N.W.2d 504 (Ct. App. 1984). In *Huff & Morse*, we explained that WIS. STAT. § 100.20(5) does not prohibit a motor vehicle repair shop from collecting or receiving payment for repairs that have not been authorized by the exact requirements of the code. *Huff & Morse*, 118 Wis. 2d at 10. Instead, a customer finding a violation of the written estimate requirement has not suffered a pecuniary loss if the customer admits to authorizing to the repairs. *See id.* at 9. However, if the customer does not admit to authorizing the repairs and the trial court

¶ 25. Following Lynch's theory would also be contrary to the legislative intent of both Wɪs. Stat. § 100.20(5) and Wɪs. Admɪɴ. Code ch. ATCP 132. Limiting pecuniary loss to the amount by which the repair shop caused the need for the repairs, or charged at above market rates, for unnecessary repairs, or for "phantom" repairs that never occurred, would emasculate the law to such an extent that consumers would essentially be back to the status quo before the legislature enacted § 100.20(5). Instead of encouraging consumers to enforce their rights and deterring prohibited conduct through liberal private. remedies, the law would leave many consumers with minimal damage awards. This would defeat the manifest object of the code by allowing repair shops to perform unauthorized repairs without the severe penalty of nonpayment. *See Baierl*, 245 Wis. 2d 632, ¶ 21 (DATCP's orders under § 100.20(2) are to be construed in a manner which reflects the intent of the regulation over one that defeats its manifest object). As we stated in *Huff & Morse*, under no legal theory can a repair shop collect for *unauthorized* repairs. *Huff & Morse*, 118 Wis. 2d.at 11.

¶ 26. The repair shop and amicus curiae, Wisconsin Auto and Truck Dealers Association, believe this construction to be unfair, especially if, as they claim is undisputed in this case, the repairs made actually fixed the vehicle in a satisfactory manner such that the consumer received a valuable benefit. We understand that and commiserate with the repair shop and amicus curiae to the extent that the repair shop acted in good

finds that the customer did not authorize the repairs as a matter of fact, then the shop *may never collect for the unauthorized repairs under any legal theory.* The lack of customer authorization is never a technical violation.

faith in not engaging in excessive and unnecessary repair. But to paraphrase an oft-repeated and now trite expression, the law is what the law is. If the association feels that the statutory damage provision is out of proportion to the harm done by the lack of authorized consent, its recourse is through the legislature, not the courts. *See Estate of Furgason v. Wisconsin DHSS*, 211 Wis. 2d 732, 740, 566 N.W.2d 169 (Ct. App. 1997) (the authority to determine policy rests with the legislature, not the courts, and courts cannot rewrite statutes to meet a party's desired construction).

¶ 27. And frankly, our view is that the requirement of a written repair estimate with an estimated price is a simple procedure that does not impose a great economic burden on repair shops. This is important because the policy makers in this instance obviously weighed that insignificant cost to the marketplace against the need to curtail the persistent practices of exploitive merchants bent on targeting the unknowledgeable motor vehicle owner. The policy makers no doubt intended to protect consumers against misunderstandings arising from less-than-clear estimates and the legal disputes and litigation that result from the fait accompli nature of claims for repair work already done. *See Osteen v. Morris*, 481 So. 2d 1287, 1290 (Fla. Dist. Ct. App. 1986).

¶ 28. We hold that a repair shop, which finds itself outside the law and which has taken money from a consumer after violating the law, causes pecuniary loss to the consumer because of the violation. This is so because the consumer has been prevented from exercising a statutory right—the right of informed consent. It is not the consumer's burden to prove that he or she would have done something differently had the proper information been given. Rather, the burden is wholly

820

upon the repair shop. Strict as it is, the policy makers obviously believed that only by exposing the repair shop industry to strict conformance at the risk of having to pay back double if sued, could the problem of consumer exploitation be resolved. *See Benkoski*, 242 Wis. 2d 652, ¶ 17. Because of our holding, whether Kaskin can ultimately prevail depends on whether he authorized the repairs. Therefore, we remand this case with directions to resolve this issue of fact.

*By the Court.*—Judgment reversed and cause remanded with directions.