COURT OF APPEALS
DECISION
DATED AND FILED

August 29, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP448**

STATE OF WISCONSIN

Cir. Ct. No. **2021CV470**

IN COURT OF APPEALS
DISTRICT IV

---

KELLY COLEMAN,

    PLAINTIFF-RESPONDENT,

V.

PICTURE PERFECT CABLE, INC.,

    DEFENDANT-APPELLANT.

---

APPEAL from an order of the circuit court for Rock County: DERRICK A. GRUBB, Judge. *Reversed and cause remanded with directions*.

Before Kloppenburg, P.J., Blanchard, and Nashold, JJ.

¶1 NASHOLD, J. Kelly Coleman contracted with Picture Perfect Cable, Inc., doing business as Buckshot General Contracting ("Buckshot"), to repair hail damage to her home. Coleman made a $12,000 down payment before work began, and the parties do not dispute that during the course of the project

Buckshot violated various provisions of WIS. ADMIN. CODE ch. ATCP 110, the Home Improvement Practices Act.[1]  Following a bench trial, the circuit court determined that Coleman's $12,000 down payment is a pecuniary loss under WIS. STAT. § 100.20(5), for which Coleman is entitled to double damages, costs, and reasonable attorney fees.[2]  On appeal, Buckshot challenges this determination, arguing that, because there was no causal connection between the down payment and Buckshot's violations, the down payment is not a pecuniary loss for which Coleman may recover under § 100.20(5).  We agree.  Accordingly, we reverse the court's award of double damages, costs, and attorney's fees to Coleman, and remand for entry of a judgment consistent with this opinion.

## BACKGROUND

¶2      The following facts are derived from the two-day bench trial and are not disputed.  As stated, Coleman contracted with Buckshot to repair hail damage to her home.[3]  Included within the scope of the project was the replacement of the roof, siding, gutters, and downspouts.  The contract states that Buckshot would be entitled to a total payment equal to the amount of insurance proceeds that Coleman received from her insurer for her hail damage claim, which ultimately was

---

[1] Unless otherwise noted, all references to WIS. ADMIN. CODE ch. ATCP 110 are to the March 2023 version, which is the current version of that chapter.  Although this case concerns Buckshot's violations of WIS. ADMIN. CODE from 2018-20, the relevant provisions of ch. ATCP 110 have not changed since that time.  For convenience, we refer to the current version of that chapter.

[2] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[3] Approximately six months after entering the initial contract, the parties entered into a revised contract that amended the scope of services that Buckshot was to provide.  Those amendments are not relevant to the issue raised on appeal, and we generally refer to both the initial and revised contract as simply "the contract."

$41,617.[4]   Before any work had begun, Coleman made the $12,000 down payment.

¶3   On two different occasions, the siding was installed but then removed because of manufacturing defects.  After the siding was removed the second time, the parties' relationship deteriorated and Coleman sought to terminate the contract.  After Coleman did so, Buckshot sent her an invoice ("the invoice") and stated that it would file a lien against her home if she did not pay the amount on the invoice.  By the time Buckshot made this statement, the statutory time period for Buckshot to file a lien against Coleman's home had expired.

¶4   Coleman did not pay the amount shown on the invoice.  She filed this action alleging breach of contract and several violations of WIS. ADMIN. CODE ch. ATCP 110.  Coleman sought to recover damages for the alleged ch. ATCP 110 violations pursuant to WIS. STAT. § 100.20(5).  *See* § 100.20(5) ("Any person suffering pecuniary loss because of a violation by any other person of … any order issued under this section … shall recover twice the amount of such pecuniary loss, together with costs, including a reasonable attorney fee.").  Buckshot counterclaimed, alleging that Coleman breached the contract and owed Buckshot for the work done prior to the contract's termination.[5]

---

[4] The contract states, "Due to the unique nature of repairs related to insurance claims, this contract does not include an explicit price because the final scope has not yet been agreed upon with the insurer.…  Buckshot agrees to bid the work using the primary insurance industry database (Xactimate) based on the scope agreed upon with your insurer …."

[5] Buckshot moved to amend its answer to include the counterclaim for breach of contract, as well as to include counterclaims for civil theft under WIS. STAT. § 895.446 and for conversion.  The circuit court granted Buckshot's motion as to the breach of contract counterclaim, but denied Buckshot's motion as to the other counterclaims.  Buckshot does not challenge this ruling and we do not discuss it further.

¶5      After the trial, the circuit court determined that the total amount that Coleman owed Buckshot for work done pursuant to the contract, not taking into account the $12,000 down payment that she already paid, was $17,747.63.  The effect was a determination that Coleman, after making the $12,000 down payment, still owed Buckshot $5,747.63.  The court also determined, and Buckshot does not dispute on appeal, that Buckshot violated three different provisions of WIS. ADMIN. CODE ch. ATCP 110, in the following ways.

¶6      First, Buckshot violated WIS. ADMIN. CODE § ATCP 110.05(2)(d) by failing to include the project's start and end dates in the contract.  *See* § ATCP 110.05(2)(d) (requiring that written home improvement contracts contain "[t]he dates or time period on or within which the work is to begin and be completed by the seller").

¶7      Second, Buckshot violated WIS. ADMIN. CODE § ATCP 110.05(2)(f) by failing to include in the contract warranties from the manufacturers of the siding, roof shingles, gutters, or downspouts.  *See* § ATCP 110.05(2)(f) (requiring that written home improvement contracts contain "[a] statement of any guarantee or warranty with respect to any products, materials, labor, or services made by the seller or which are required to be furnished to the buyer under [WIS. ADMIN. CODE §] ATCP 110.04(1)"); § ATCP 110.04(1) ("A seller shall give a buyer a copy of every written warranty made with respect to labor, services, products, or materials furnished in connection with a home improvement.").[6]

---

[6] As noted, approximately six months after entering the initial contract, the parties entered into a revised contract.  Neither version of the contract included the project's start or end dates, or the warranties for the siding, shingles, gutters, or downspouts.

¶8 Third, Buckshot violated, in two separate ways, WIS. ADMIN. CODE § ATCP 110.02(11), which prohibits persons in the business of making or selling home improvements from "[m]ak[ing] any false, deceptive, or misleading representation in order to induce any person to enter into a home improvement contract, to obtain or keep any payment under a home improvement contract, or to delay performance under a home improvement contract." First, Buckshot violated § ATCP 110.02(11) by misrepresenting in the invoice what Coleman owed Buckshot for the siding installation. Specifically, Buckshot did not correctly apply a $7,275.06 credit that Buckshot received from the siding manufacturer for the replacement of the defective siding, and Buckshot charged a $1,350 "warranty work profit" for the third installation of the siding, even though Buckshot did not perform the third installation before Coleman terminated the contract. Second, Buckshot violated § ATCP 110.02(11) by stating that it would file a lien against Coleman's home if Coleman did not pay the amount that Buckshot misrepresented was still owing on the invoice. As noted, when Buckshot made this statement, the statutory six-month time period for filing a lien had expired because it had been more than a year since Buckshot had performed any work under the contract. *See* WIS. STAT. § 779.06(1) (requiring that liens be filed "within 6 months from the date the lien claimant performed, furnished, or procured the last labor, services, materials, plans, or specifications"). In stating it would file the lien, Buckshot implicitly misrepresented that it could file a lien.

¶9 Because Buckshot violated WIS. ADMIN. CODE ch. ATCP 110, pursuant to WIS. STAT. § 100.20(5), Coleman was entitled to twice the amount of any pecuniary loss that was caused by any of Buckshot's violations, plus costs and reasonable attorney fees. Buckshot argued at trial that there was no evidence that Coleman suffered any damages as a result of any of Buckshot's alleged violations.

¶10    The circuit court rejected this argument.  Instead, based on the court's interpretation of case law, which we discuss below, the court determined that Coleman's $12,000 down payment constituted a pecuniary loss under WIS. STAT. § 100.20(5).  The court doubled that amount, subtracted the $17,747.63 that Coleman owed Buckshot for Buckshot's breach of contract counterclaim, and then added $14,389.50 in attorney fees, $146.68 in filing fees, and $379.45 in costs, for a total award in Coleman's favor of $21,168.00.[7]

¶11    After the circuit court explained its determination regarding damages, Buckshot sought clarification regarding which WIS. ADMIN. CODE ch. ATCP 110 violations caused Coleman's pecuniary loss.  The court declined to specify, saying:

> I think you're trying to pin the Court down there.  Is this $12,000 dollars for one specific violation, another violation?  I don't think the case law demands that I clarify that.  I find that there were those violations and that was [Coleman's] pecuniary loss based upon those violations, one or all.

¶12    Buckshot appeals.

---

[7] We observe that the circuit court, after doubling Coleman's $12,000 down payment as her pecuniary loss, then subtracted the total of what Coleman owed Buckshot under the contract—$17,747.63—even though Coleman paid Buckshot $12,000 of that $17,747.63 total so that only $5,747.63 remained outstanding.  However, because we are remanding this case in light of our conclusion that Coleman may not recover under WIS. STAT. § 100.20(5), and because the circuit court will have to recalculate the proper award of damages consistent with this opinion, we need not determine whether the court improperly calculated the amount that Coleman was to recover under § 100.20(5).

**DISCUSSION**

¶13     The parties do not dispute that Buckshot violated WIS. ADMIN. CODE ch. ATCP 110 in three different ways.  Rather, the parties dispute whether Coleman's $12,000 down payment is a pecuniary loss caused by any or all of Buckshot's violations, for which Coleman may recover under WIS. STAT. § 100.20(5).  This appeal thus requires us to interpret and apply § 100.20(5), which presents a question of law that we review de novo.  *See **Benkoski v. Flood**, 2001 WI App 84, ¶24, 242 Wis. 2d 652, 626 N.W.2d 851.  This appeal also involves the interpretation of administrative rules, which we likewise review de novo.  **Gorchals v. DHFS**, 224 Wis. 2d 541, 545, 591 N.W.2d 615 (Ct. App. 1999).

¶14     The Wisconsin Department of Agriculture, Trade and Consumer Protection ("DATCP") adopted WIS. ADMIN. CODE ch. ATCP 110 pursuant to its authority under WIS. STAT. § 100.20(2).  **Grand View Windows, Inc. v. Brandt**, 2013 WI App 95, ¶24, 349 Wis. 2d 759, 837 N.W.2d 611.  As noted, § 100.20(5) states, "Any person suffering pecuniary loss because of a violation by any other person of … any order issued under this section … shall recover twice the amount of such pecuniary loss, together with costs, including a reasonable attorney fee." *See also **Rayner v. Reeves Custom Builders, Inc.**, 2004 WI App 231, ¶13, 277 Wis. 2d 535, 691 N.W.2d 705 (stating that ch. ATCP 110 was promulgated as a general order pursuant to § 100.20); **Kaskin v. John Lynch Chevrolet-Pontiac Sales, Inc.**, 2009 WI App 65, ¶9, 318 Wis. 2d 802, 767 N.W.2d 394 (explaining that § 100.20(5) "'supplies the teeth' to … DATCP orders" by "provid[ing] a private remedy for consumers who fall victim to the unfair methods of competition and trade practices prohibited by … general orders of [DATCP] promulgated under § 100.20(2)" (quoting **Benkoski**, 242 Wis. 2d 652, ¶16)).   "[A] party

7

asserting a pecuniary loss for the purposes of … § 100.20(5) must show that there is a causal connection between a prohibited trade practice under WIS. STAT. ch. ATCP Chapter 110 and the damage incurred." *Grand View*, 349 Wis. 2d 759, ¶21.

¶15    Consistent with WIS. STAT. § 100.20(5)'s causation requirement, in cases in which there was no evidence to support a determination that a homeowner suffered a pecuniary loss because of a violation of WIS. ADMIN. CODE ch. ATCP 110, we have concluded that the consumer could not recover under § 100.20(5). *See, e.g.*, *Grand View*, 349 Wis. 2d 759, ¶¶18-33.  Buckshot argues that this case is analogous to *Grand View*.  We agree.

¶16    In *Grand View*, a contractor entered into an agreement with a homeowner to install new siding.  *Id.*, ¶2.  After removing the old siding, the contractor did not return to install the new siding for approximately a week and a half.  *Id.*  The contractor sued the homeowner to recover the final payment for the work, which the homeowner refused to make, and the homeowner counterclaimed, alleging breach of contract and numerous violations of WIS. ADMIN. CODE ch. ATCP 110.  *Id.*, ¶3.  The jury found that the contractor violated § ATCP 110.02(7)(c) by failing to provide a timely notice of an impending delay in the contract performance, and that the homeowner's damages resulting from the contractor's violation were $250.  *Id.*, ¶8.

¶17    On appeal, the contractor argued that there was insufficient evidence to support this finding.  *Id.*, ¶20.  We agreed and explained that the evidence was insufficient, not only to support a damages award in the specific amount of $250, but also to support a finding that the homeowner had suffered *any* damages as a result of the contractor's violation.  We "searched the record in vain to find any

evidence that connects a specific item of damage to the Wis. Admin. Code § ATCP 110 violation the jury found." *Id.*, ¶31. We further stated that "[n]either [the homeowner], nor her witnesses, testified as to what she could have done had [the contractor] informed her that there would be a delay in beginning or completing the siding work," and that "[t]he record simply does not support a finding that *not telling* [the homeowner] about the delay caused damages in the amount of $250 or any other sum." *Id.*, ¶32 (emphasis in original); *see also id.*, ¶35 ("Pecuniary damages stemming from [the contractor's] failure to give notice of a delay are not supported by any evidence. Because the record does not support damages for a pecuniary loss, there are no damages to double pursuant to Wis. Stat. § 100.20(5)."). Accordingly, we "reverse[d] the order confirming pecuniary damages in the amount of $250 because there [was] no evidence establishing a causal connection between the [violation] and any damages." *Id.*, ¶47.

¶18 Coleman argues that *Grand View* is distinguishable. Specifically, she argues that in *Grand View*, there was no factual basis in the record for the amount of $250 that the jury awarded for the Wis. Admin. Code ch. ATCP 110 violation, whereas here, there is a factual basis for the circuit court's determination that Coleman suffered a $12,000 pecuniary loss, because that is the amount that she paid Buckshot. To be sure, unlike the arbitrary award of $250 in *Grand View*, here, there was evidence presented as to the amount of $12,000: it is the down payment that Coleman paid Buckshot. However, as stated, in *Grand View* we concluded not only that there was insufficient evidence to support a finding that the violation resulted in damages in the specific amount of $250, but also that there was insufficient evidence to support a finding that the violation resulted in *any* damages. Pertinent here, we stated that there was "no evidence establishing a causal connection between the [violation] and any damages." *Id.*, ¶47. As we

9

now explain, this case is analogous to *Grand View* because Coleman did not argue, or present evidence to show, that there is a causal connection linking any of Buckshot's three violations to Coleman's $12,000 down payment.

¶19     We begin by noting that Coleman fails to develop any argument on appeal that there is a causal connection, much less does she explain what that causal connection would be.  Her argument is limited to the proposition, endorsed by the circuit court here, that the $12,000 down payment is a pecuniary loss under WIS. STAT. § 100.20(5) for which she can recover based on case law.  It is not our role to develop an argument for Coleman.  *See Industrial Risk Insurers v. American Eng'g Testing, Inc.*, 2009 WI App 62, ¶25, 318 Wis. 2d 148, 769 N.W.2d 82 ("[W]e will not abandon our neutrality to develop arguments.").  Given our conclusion, explained below, that Coleman's argument premised on case law is unavailing, Coleman provides us with no basis to conclude that the required causal connection exists.

¶20     Further, our own review of the record shows that Coleman did not present evidence showing a causal connection between any or all of Buckshot's violations and Coleman's $12,000 down payment, or for that matter anything else that could qualify as a pecuniary loss.  At trial, Coleman testified to Buckshot's three violations.  Coleman also testified about what she described as shortcomings in the work that Buckshot performed.

¶21     In addition to Coleman's own testimony, Coleman called Phillip Farberg and James Belanger as witnesses.  Farberg is a general contractor, and Belanger is a construction consultant, home inspector, custom home builder, and real estate agent.  Farberg testified that the roof was not properly installed, that it needed to be replaced, and that doing so would cost $13,580.  Belanger testified

that Buckshot's work was substandard in a number of ways, and he testified to what would be necessary to bring the work up to industry standards. Neither Coleman nor the witnesses she called testified as to how any of Buckshot's violations or any combination of them might have caused Coleman to suffer a pecuniary loss.

¶22 First, Coleman failed to establish at trial that she suffered a pecuniary loss because of Buckshot's failure to include the project's start and end dates in the contract. *See* WIS. ADMIN. CODE § ATCP 110.05(2)(d); *Snyder*, 260 Wis. 2d 770, ¶16 (concluding that homeowners were not entitled to damages under WIS. STAT. § 110.05(2)(d) because they "failed to allege any pecuniary loss due to the failure to include start and completion dates").

¶23 Similarly, Coleman failed to demonstrate that she suffered a pecuniary loss because of Buckshot's failure to include in the contract the warranties from the manufacturers of the siding, roof shingles, gutters, or downspouts. *See* WIS. ADMIN. CODE § ATCP 110.05(2)(f). For example, neither Coleman, nor any of the witnesses, testified as to what she could have done, or what damages might have been avoided, had Buckshot included the warranties in the contract. *See* *Grand View*, 349 Wis. 2d 759, ¶32. Indeed, despite Buckshot's failure to provide the warranties, Coleman found the warranty for the roof shingles herself, and Coleman was nonetheless able to have the siding replaced under warranty after manufacturing defects were discovered.

¶24 Coleman also did not show that she suffered a pecuniary loss because of Buckshot's misrepresentations regarding the amount that Coleman owed and Buckshot's ability to file a lien on her home. *See* WIS. ADMIN. CODE § ATCP 110.02(11) (prohibiting persons in the business of making or selling

11

home improvements from "[m]ak[ing] any false, deceptive, or misleading representation in order to induce any person to enter into a home improvement contract, to obtain or keep any payment under a home improvement contract, or to delay performance under a home improvement contract"); *see also* **Grand View**, 349 Wis. 2d 759, ¶21 ("'[T]he test ... for determining whether a representation caused pecuniary loss is "[w]hether plaintiff would have acted in its absence."'" (quoting **K & S Tool & Die Corp. v. Perfection Mach. Sales, Inc.**, 2006 WI App 148, ¶41, 295 Wis. 2d 298, 720 N.W.2d 507, *aff'd*, 2007 WI 70, ¶41, 301 Wis. 2d 109, 732 N.W.2d 792) (alterations in original)).

¶25 Specifically, Coleman did not show that she made the $12,000 down payment, or that Buckshot kept it, as a result of these misrepresentations. Buckshot did not make these misrepresentations until after Coleman had made the $12,000 down payment, which was the only payment that Coleman made to Buckshot. Accordingly, Coleman has failed to show that she was induced to make the $12,000 down payment, or any other payment, by Buckshot's misrepresentations. Nor does Coleman direct us to any basis in the record to conclude that Buckshot's misrepresentations allowed Buckshot to keep the $12,000 down payment. For example, Coleman did not present evidence showing that, were it not for Buckshot's misrepresentations, Coleman could have sought the return of the down payment. Such would likely be the case if Buckshot were entitled to less than $12,000 for its work and if Buckshot made the misrepresentations in order to keep all of the $12,000 down payment. However, the circuit court determined that, given the work that Buckshot had performed, Coleman owed Buckshot a total of $17,747.63 pursuant to the contract. Buckshot's misrepresentations thus cannot have caused Buckshot to keep all or

any part of Coleman's $12,000 down payment, because Buckshot was entitled to retain all $12,000 for the work that Buckshot had done.[8]

¶26    As summarized above, the circuit court did not explain how any or all of Buckshot's violations were causally linked to Coleman's $12,000 down payment.  Instead, the court determined that the $12,000 down payment is a pecuniary loss for "one or all" of the violations, for which Coleman can recover under WIS. STAT. § 100.20(5), based on the court's interpretation of case law—namely, *Moonlight v. Boyce*, 125 Wis. 2d 298, 372 N.W.2d 479 (Ct. App. 1985); *Hughes v. Chrysler Motors Corp.*, 197 Wis. 2d 973, 542 N.W.2d 148 (1996); *Benkoski v. Flood*, 2001 WI App 84, 242 Wis. 2d 652, 626 N.W.2d 851; and *Pliss v. Peppertree Resort Villas, Inc.*, 2003 WI App 102, 264 Wis. 2d 735, 663 N.W.2d 851.  Coleman generally relies on this case law on appeal.  However, as we now explain, this case law does not support Coleman's position.

¶27    In *Moonlight*, a landlord violated WIS. ADMIN. CODE ch. ATCP 134 by failing to timely return a tenant's security deposit and failing to provide an itemized list of deductions.  *Moonlight*, 125 Wis. 2d at 304.  The tenant argued that he suffered a pecuniary loss in the amount of his security deposit, and that he was entitled to the remedies available under WIS. STAT. § 100.20(5).  *Id.* at 302.  The circuit court determined that, because the landlord sustained damages on his counterclaim in an amount exceeding the security deposit, the tenant did not suffer a pecuniary loss.  *Id.* at 303.  We reversed, concluding that "once it is determined that the landlord has violated the Wisconsin Administrative Code provisions for the return of a tenant's security deposit, the tenant suffers a pecuniary loss under

---

[8] We discuss this issue further, *infra*, at ¶¶34-35.

[§ 100.20(5)] in the amount of the security deposit *regardless of the amount of damages the landlord may recover on a counterclaim.*" ***Id.*** at 305-06 (emphasis in original).

¶28    In ***Hughes***, Chrysler violated an earlier version of Wisconsin's "lemon law" by selling a defective vehicle to a consumer and by failing to timely replace or repurchase the vehicle within 30 days of the consumer's statutory demand. ***Hughes***, 197 Wis. 2d at 977-78, 982; *see also* WIS. STAT. § 218.0171.[9] The lemon law, like WIS. STAT. § 100.20(5), allowed for the recovery of twice the amount of any pecuniary loss caused by a violation, ***Hughes***, 197 Wis. 2d at 982. Chrysler argued that the consumer's pecuniary loss was limited to the consumer's out-of-pocket expenses, ***id.*** at 979, but our supreme court concluded that the purchase price of the vehicle constituted the consumer's pecuniary loss, ***id.*** at 979, 987.

¶29    In ***Benkoski***, the operator of a mobile home park violated a provision of the administrative code by placing an unreasonable restriction on the sale of a mobile home, which "thwarted a potential sale" by the mobile home's owner. ***Benkoski***, 242 Wis. 2d 652, ¶¶3, 4.  The mobile home owner argued that he was entitled to remedies under WIS. STAT. § 100.20(5), including double his pecuniary losses caused by the violation, ***id.***, ¶28, which the parties did not dispute consisted of what would have been the purchase price and the owner's advertising costs, ***id.***, ¶25.  The park operator argued that the fair market value of the home, which the owner still possessed, should have been subtracted before the owner's

---

[9] At the time that ***Hughes v. Chrysler Motors Corp.***, 197 Wis. 2d 973, 542 N.W.2d 148 (1996), was decided, the lemon law statute was numbered WIS. STAT. § 218.015 (1993-94).

pecuniary losses were doubled pursuant to § 100.20(5). *Id.*, ¶26. We rejected that argument, citing the reasoning in *Hughes* and *Moonlight,* and concluded that the mobile home owner's pecuniary losses were properly doubled before subtracting the fair market value of the home. *Benkoski*, 242 Wis. 2d 652, ¶¶27-29.

¶30 Coleman argues that the $12,000 down payment here is analogous to the pecuniary losses in these cases—the security deposit in *Moonlight*, the purchase price of the car in *Hughes*, and what would have been the sale price of the mobile home and the owner's advertising costs in *Benkoski*. According to Coleman, because Buckshot violated WIS. ADMIN. CODE ch. ATCP 110 and retained the $12,000 down payment, those facts establish that the payment was a pecuniary loss under WIS. STAT. § 100.20(5) for which she can recover double damages. We disagree. In each of the cases discussed above, the pecuniary loss resulted from a violation; in contrast, as we have explained, here, Coleman did not present evidence of a causal connection linking any or all of Buckshot's violations to a pecuniary loss, nor does she develop an argument as to how such a causal connection is established.

¶31 The circuit court also relied on *Pliss*. There, the purchasers of time-shares sued the sellers, alleging, among other claims, that the sellers violated a provision of WIS. ADMIN. CODE ch. ATCP 121 that prohibits using "referral selling plans" to induce sales unless the compensation that is offered to a buyer or lessee under the plan is provided before the sale. *Pliss*, 264 Wis. 2d 735, ¶¶2, 5-7, 12; *see also id.*, ¶10 (quoting the definition of "referral selling plan" as "any method of sale where the seller or lessor, as an inducement for a consumer sale, offers compensation to a prospective buyer or lessee either for a) names of other prospective buyers or lessees, or b) otherwise aiding the seller or lessor in making consumer sales" (emphasis omitted)). Default judgment was entered against the

sellers and the circuit court awarded double damages, costs, and attorney fees to the buyers pursuant to WIS. STAT. § 100.20(5). *Id.*, ¶6.

¶32     On appeal, the sellers argued that the complaint did not allege that the buyers suffered a pecuniary loss as required by WIS. STAT. § 100.20(5). *Id.*, ¶20. We disagreed, explaining that, because "the prohibition is designed to protect buyers from being induced into a consumer sale by a referral selling plan by promising future payments that may never occur," "the pecuniary loss is … the money paid [by the consumer] for the product that the consumer was improperly induced into buying due, in part or in whole, to the referral selling plan." *Id.*, ¶21.

¶33     We have summarized *Moonlight*, *Hughes*, and *Pliss* as stating the following rule: "where a general order promulgated by DATCP under WIS. STAT. § 100.20(2) *prohibits the retention or receipt of the customer's money*, the consumer suffers a pecuniary loss under § 100.20(5) *in the amount that was wrongfully retained or received*." *Kaskin*, 318 Wis. 2d 802, ¶24 (emphasis added). Coleman argues that these cases establish that, because Buckshot violated WIS. ADMIN. CODE ch. ATCP 110, Coleman's $12,000 down payment to Buckshot constitutes a pecuniary loss pursuant to § 100.20(5) in that it was wrongfully retained by Buckshot. However, as Buckshot points out, unlike the violations in *Moonlight* and *Hughes*—which resulted, respectively, from the landlord's failure to timely return the security deposit or an itemized list of deductions, and from Chrysler's failure to replace or repurchase the vehicle—the provisions of ch. ATCP 110 that Buckshot violated do not prohibit the retention of Coleman's down payment. Nor, as in *Pliss*, was Buckshot's receipt of the down payment a result of Buckshot's misrepresentations. Thus, Coleman fails to show that she satisfied the rule stated in *Kaskin*.

¶34    Despite that failure, citing **_Moonlight_** specifically, Coleman argues that the $12,000 down payment is a pecuniary loss under WIS. STAT. § 100.20(5) because "[t]he damages to Coleman must … be calculated independently of any damages Buckshot may recover on its counterclaims."  Coleman thus appears to argue that the $12,000 down payment is a pecuniary loss even though the circuit court found that Buckshot was entitled to $17,747.63 for work that Buckshot performed under the contract.  However, as stated, **_Moonlight_** is distinguishable in that the security deposit there was wrongfully retained, notwithstanding the landlord's successful counterclaim for damages, because the landlord failed to timely return the security deposit or provide an itemized list of withholdings, as required by WIS. ADMIN. CODE ch. ATCP 134.  Because there is no analogous requirement here that Buckshot had to either return Coleman's down payment or provide an itemized list of charges, **_Moonlight_** is distinguishable.[10]

¶35    The significance of this distinction is apparent from our decision in **_Pierce v. Norwick_**, 202 Wis. 2d 587, 550 N.W.2d 451 (Ct. App. 1996).  There, landlords withheld their tenants' security deposit, and (unlike in **_Moonlight_**) provided the tenants with an itemized list of deductions for unpaid rent and alleged

---

[10] Further, as Buckshot points out, there are important differences between a down payment for a home improvement project and a security deposit.  Notably, there is normally no expectation that a down payment will be returned to the payer.  To be sure, under certain circumstances, WIS. ADMIN. CODE § ATCP 110.07 requires the return of payments made pursuant to home improvement contracts.  For example, if a contractor "fails to provide the materials or services by a deadline specified in the home improvement contract," or if "[t]he [consumer] believes that the [contractor] has failed to provide the materials or services in a timely manner, and the home improvement contract specifies no deadline for the seller to provide the materials or services," then the consumer may cancel the contract and "[d]emand return of all payments which the [contractor] has not yet expended on the home improvement."  Sec. ATCP 110.07(1)(a), (c), (2)(a), (b); _see also_ § ATCP 110.07(4)(a) (requiring the return of payments within 15 days).  However, here, Coleman made no such demand, and even if she did, Coleman has not argued, nor is it apparent to us, that Coleman would have been entitled to the return of any portion of the down payment.

property damage. *Pierce*, 202 Wis. 2d at 591-92. However, the landlords violated WIS. ADMIN. CODE ch. ATCP 134 by intentionally misrepresenting or falsifying the landlords' claims against the tenants' security deposit. *Id.* The tenants filed a lawsuit alleging that the landlords fraudulently withheld the security deposit. The landlords then sued the tenants for the amount of the unpaid rent and the alleged damages to the premises. *Id.* at 591. On appeal, the tenants argued that, under *Moonlight*, the entire amount of their security deposit should be doubled before the landlords' damages were offset. *Pierce*, 202 Wis. 2d at 595. We disagreed and concluded that "the method of damages calculation outlined in *Moonlight* should be confined to those instances where a landlord retains a security deposit and fails to provide an itemization of damages." *Pierce*, 202 Wis. 2d at 595. In contrast,

> [w]hen a landlord complies with the notification requirement and provides a tenant with a written statement accounting for any amount withheld from the security deposit, a later determination that the landlord … misrepresented or falsified damages claims will result in a doubling of *only that pecuniary loss which remains after an offset for the landlord's actual damages has been included*.

*Id.* at 596 (emphasis added). As a result, in *Pierce* the amount of the tenants' security deposit—$1,000—was offset by the landlord's damages award—$889—and the difference of $111 was doubled pursuant to WIS. STAT. § 100.20(5). *Id.* at 592, 596. Thus, *Pierce* demonstrates that a violator's counterclaims are not, as a rule, irrelevant when determining whether a consumer may recover under WIS. STAT. § 100.20(5). Moreover, *Pierce* also reinforces the rule stated in *Kaskin* that a pecuniary loss in the form of an amount retained may entitle a plaintiff to recover under § 100.20(5), but only when the defendant has violated a rule prohibiting such retention.

¶36 In addition to the case law relied upon by the circuit court, Coleman relies on two unpublished decisions, *Henchey v. Wausau Landmark Corp.*, No. 2021AP1684, unpublished slip op. (WI App May 2, 2023), and *Heiman v. Roe*, No. 2020AP2066, unpublished slip op. (WI App Oct. 25, 2022), for their persuasive value. These opinions do not support Coleman's position.

¶37 In *Henchey*, we concluded that a rental agreement was void and unenforceable pursuant to WIS. ADMIN. CODE § ATCP 134.08(9) because the agreement allowed the landlord "to terminate a tenancy if a tenant made use of the premises for an unlawful purpose or permitted another to make use of the premises for an unlawful purpose and a person who lawfully resided with the tenant was a victim of that crime." *Henchey*, No. 2021AP1684, ¶33. We further concluded that the tenant's pecuniary loss under WIS. STAT. § 100.20(5) consisted of all of the rent that the tenant paid under the rental agreement. *Id.*, ¶¶41-42. Coleman argues that we did so even though the tenant's rent payments were not caused by the landlord's violations. However, Coleman's arguments miss the mark: in *Henchey*, our determination as to the tenant's pecuniary loss was based on the landlord's concession of the issue resulting from the landlord's failure to provide a developed response to the tenant's argument on this point. *Id.*

¶38 In *Heiman*, a landlord violated WIS. ADMIN. CODE § ATCP 134.06(4)(a) by failing to return, and to properly itemize deductions from, a security deposit. *Heiman*, No. 2020AP2066, ¶¶17-24. As in *Moonlight*, the tenants owed the landlord for damages in excess of the security deposit amount, *Heiman*, No. 2020AP2066, ¶¶11, 25, and the issue was whether the tenants were "entitled to the calculation of their damages based upon [the landlord's] § ATCP 134.06(4)(a) violation regardless of the amount the [circuit] court determined that they owed to [the landlord]," *Heiman*, No. 2020AP2066, ¶25.

19

The tenants argued, consistent with *Moonlight*, that even though they owed the landlord in excess of their security deposit, they were nonetheless entitled to recover under WIS. STAT. § 100.20(5), including for double the amount of their security deposit. *Heiman*, No. 2020AP2066, ¶26. In contrast, the landlord argued that our decision in *Pierce* controlled. We concluded in *Heiman* that *Moonlight* controlled because the landlord, like the landlord in *Moonlight*, "failed to provide … a written statement accounting for the amounts withheld." *Heiman*, No. 2020AP2066, ¶30.

¶39 Coleman argues that *Heiman* "reiterate[s] the rule that a consumer's pecuniary loss must be reviewed independently from any amount awarded to the opposing party." We reject Coleman's argument under *Heiman* for the same reasons we reject Coleman's argument under *Moonlight*: Coleman's "rule" does not account for our decision in *Pierce*, and *Heiman* is distinguishable for the same reason that *Moonlight* is—here, there was no violation of an analogous requirement that Buckshot either return the down payment or provide an accounting of its claims.[11]

---

[11] Coleman asserts that Buckshot threatened to file a lien after Coleman questioned the amounts charged in the invoice, and that "[t]his is precisely the type of unfair and oppressive conduct that [WIS. ADMIN. CODE ch. ATCP 110] was intended to prevent." Coleman does not develop this assertion into an argument supported by pertinent citations to the record and legal authority, and we may reject it on that basis. *See Clean Wis., Inc. v. PSC*, 2005 WI 93, ¶180 n.40, 282 Wis. 2d 250, 700 N.W.2d 768 ("We will not address undeveloped arguments."). In any event, to the extent that Coleman intends to analogize Buckshot's failure to provide Coleman with more information regarding the amounts charged in the invoice to the failure of the landlords in *Moonlight* and in *Heiman* to return the security deposits or provide itemized lists of deductions, we reject the argument. In *Moonlight* and in *Heiman*, the landlords' failures to provide itemized deductions of their withholdings violated WIS. ADMIN. CODE ch. ATCP 134. *Moonlight v. Boyce*, 125 Wis. 2d 298, 304, 372 N.W.2d 479 (Ct. App. 1985); *Heiman v. Roe*, No. 2020AP2066, ¶¶17-24, unpublished slip op. (WI App Oct. 25, 2022). In contrast, as stated, Buckshot was not obligated under ch. ATCP 110 to provide an analogous itemized accounting of Coleman's $12,000 down payment.

¶40    In sum, for a consumer to recover under WIS. STAT. § 100.20(5), the consumer must have suffered a pecuniary loss that was caused by a violation of an administrative rule promulgated under § 100.20.  Here, Coleman did not present any evidence showing a causal connection between Buckshot's violations of WIS. ADMIN. CODE ch. ATCP 110 and Buckshot's receipt or retention of Coleman's $12,000 down payment (or any other pecuniary loss).  Additionally, the case law interpreting § 100.20(5) that Coleman and the circuit court relied on does not support Coleman's argument that the evidence here establishes a causal connection such that Coleman may recover under § 100.20(5).  Because Coleman fails to show that her $12,000 down payment is a pecuniary loss that was caused by Buckshot's violations, Coleman cannot recover under § 100.20(5).[12]

---

[12] Coleman argues that the conclusion we reach here would frustrate the purposes underlying WIS. STAT. § 100.20(5) and WIS. ADMIN. CODE ch. ATCP 110.  However, "'[i]n construing or interpreting a statute the court is not at liberty to disregard the plain, clear words of the statute.'"  *Kalal v. Circuit Ct. for Dane Cnty.*, 2004 WI 58, ¶46, 271 Wis. 2d 633, 681 N.W.2d 110 (quoting *State v. Pratt*, 36 Wis. 2d 312, 317, 153 N.W.2d 18 (1967)); *see also id.*, ¶45 ("[S]tatutory interpretation 'begins with the language of the statute.  If the meaning of the statute is plain, we ordinarily stop the inquiry.'" (quoted source omitted)).  Here, § 100.20(5) unambiguously states that to recover under § 100.20(5), a consumer's pecuniary loss must have been caused by a violation of an order promulgated under § 100.20.

Coleman also argues that even if this court disagrees with the circuit court's analysis, this court "should nevertheless affirm the damages award because it is consistent with the pecuniary loss Coleman suffered from Buckshot's failure to provide a manufacturer's warranty for the roof repairs."  Specifically, Coleman argues that "[t]he record is clear" that the roof was not properly installed; that the manufacturer of the shingles would thus not warranty the roof; that Coleman was thus deprived of what she bargained for (namely, a roof that would be covered by warranty); and that the record shows that it would cost $12,410 to replace the roof, "which is almost identical to the circuit court's calculation of damages."  However, the circuit court explicitly found that "[t]here's nothing in this record that says that the warranty from the manufacturer is voided on the roof."  Coleman does not argue that we may disregard this finding, and we reject Coleman's argument for this reason.  *See Benkoski v. Flood*, 2001 WI App 84, ¶9, 242 Wis. 2d 652, 626 N.W.2d 851 (we uphold a circuit court's findings of fact unless they are clearly erroneous).

**CONCLUSION**

¶41     For the reasons stated, we reverse the circuit court's award under WIS. STAT. § 100.20(5) of double damages, costs, and attorney's fees to Coleman, and we remand for entry of a judgment consistent with this opinion.

*By the Court.*—Order reversed and cause remanded with directions.

Not recommended for publication in the official reports.